UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

GEORGE SOULIOTES,              )  1:06-cv-00667 AWI MJS HC

               Petitioner,    )  FINDING AND RECOMMENDATION
                         )  REGARDING PETITION FOR WRIT OF
    v.                     )  HABEAS CORPUS
                         )
RANDY GROUNDS, Warden,    )
                         )
            Respondent.   )
_____)

I.    **INTRODUCTION**

       Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. He is represented by Jimmy S. McBirney, Shannon C. Leong, Alexis Yee-Garcia and Thomas S. McConville of Orrick, Herrington & Suitcliffe LLP, and Linda Starr, Maitreya A. Badami, and Megan G. Crane of the Northern California Innocence Project. Respondent, Randy Grounds, as warden of Salinas Valley State Prison, is hereby substituted as the properly named respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. Respondent is represented by Kathleen A. McKenna of the Office of the Attorney General of California.

       The issues raised in the petition arise from the following history:

       On January 15, 1997, a fire occurred at rental property owned by Petitioner. Three tenants died in the fire.

On January 25, 1999, Petitioner was prosecuted for arson and three counts of first degree murder with special circumstances. The prosecution sought the death penalty. At trial, the prosecution presented fifty witnesses. Fire investigators testified with absolute conviction that the fire was intentionally set. A state criminalist testified that flammable compounds, i.e., accelerants, that could be used to start the fire were found at the scene and on Petitioner's shoes. An eyewitness testified that she saw someone ultimately identified as Petitioner at the scene just before the fire. A chain of circumstantial evidence was introduced in support of these facts. In defense, Petitioner presented several expert witnesses, including: an expert in mechanical engineering, forensics and fire investigation to refute the state fire investigators conclusions that the fire had been intentionally set and that Petitioner had been at the scene of the fire; a psychologist to describe shortcomings in eyewitness identifications and the effects of post-event information on identification accuracy; and a forensic psychiatrist to discuss the adult victim's mental health history. Petitioner also presented several lay witnesses to show he had no financial motive to commit arson, bore no ill-will toward the victims, and to otherwise undermine the prosecution's claims. After three days of deliberation, the jury was unable to reach a verdict. A mistrial was declared.

On March 13, 2000, Petitioner's second trial commenced. The prosecution presented the same fifty witnesses who provided substantially the same testimony as at the first trial. The prosecution advanced the same theories as to how the fire was intentionally set.[1] Petitioner's counsel, the same counsel who represented Petitioner at the first trial, promised to present several witnesses, most specifically the expert witness on cause and origin of the fire, and promised to prove Petitioner's innocence. Defense witnesses anticipated being called. However, after the prosecution closed its case-in-chief, Petitioner's counsel rested without presenting any additional witnesses. After several hours

---

[1] The only slight deviation was when one witness, Earl Linam who had been called as a witness for the prosecution during the first trial, was called out of turn as a defense witness during the prosecution's case in chief.

of deliberation, the jury found Petitioner guilty on all counts. During the penalty phase, the jury determined Petitioner should be sentenced to life without the possibility of parole.

Petitioner, through different counsel, pursued and was denied post-conviction relief in state court. On May 30, 2006, Petitioner filed the instant federal petition for habeas corpus relief. However, his counsel mistakenly calculated the statutory deadline for filing a federal petition for habeas corpus. The petition was filed five days late. Respondent moved to dismiss the petition as untimely. The District Court dismissed the petition on March 20, 2008. On August 17, 2011, the Ninth Circuit Court of Appeals reversed the dismissal of the petition and remanded the matter to this Court for determination, in "an expedited manner," of the applicability of an equitable exception to the statute of limitations. After conducting an evidentiary hearing, the Court found that Petitioner made a sufficient showing of actual innocence to serve as an equitable exception to the statute of limitations set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The finding of actual innocence was predicated in large part on Respondent's stipulation to the scientific inaccuracy of much of the prosecution's expert witness testimony at trial.

Accordingly, Petitioner is entitled to have his claims heard on the merits.

## II.   CLAIMS PRESENTED IN PETITION

Petitioner presents seven claims for relief in his first amended petition for writ of habeas corpus (ECF No. 151):

1.    Petitioner is actually innocent and entitled to relief under Herrera v. Collins, 506 U.S. 390, 417 (1993);

2.    Petitioner's trial counsel was ineffective in failing to present a fire expert in Petitioner's defense;

3.    Petitioner's trial counsel was ineffective in failing to present additional witnesses in Petitioner's defense;

4.    Petitioner's trial counsel was ineffective in failing to cross-examine the prosecution's fire experts using National Fire Protection Association

-3-

("NFPA") 921;[2]

5.     The jurors committed misconduct in considering extrinsic information during deliberation;

6.     Petitioner's due process rights were violated by the use of fundamentally unreliable expert testimony and evidence; and

7.     Cumulative error.

## III.    FACTUAL AND PROCEDURAL SUMMARY

As described by the California Court of Appeal, Fifth Appellate District, Petitioner was convicted of arson and three counts of murder:[3]

> As of January 1997, Daniel Jones, his wife (Michelle), and their children (six-year-old Daniel, Jr., and three-year-old Amanda) were renting a Modesto home from [Petitioner]. [Petitioner] was in the process of evicting them. In the early morning hours of January 15, the house burned down. Michelle and the children perished. Due to the intensity of the flames and evidence that an accelerant–possibly a medium petroleum distillate such as charcoal lighter fluid or paint thinner--was poured inside the house, fire investigators determined this was an arson fire. Shortly before the blaze, [Petitioner]'s motor home was seen in the vicinity, and [Petitioner] was observed carrying something into the yard of the house. [Petitioner]'s shoes tested positive for medium petroleum distillate.

> [Petitioner]'s first trial ended in a mistrial when the jury was unable to reach a verdict. A second jury convicted [Petitioner] of three counts of murder (Pen. Code, § 187; counts I-III) and one count of arson of an inhabited structure (§ 451, subd. (b); count IV). As to counts I through III, the jury found true arson-murder and burglary-murder special circumstances (§ 190.2, subd. (a)(17)) and, as to count III, a multiple-murder special circumstance (§ 190.2, subd. (a)(3)), but rejected the prosecution's request for the death penalty. [Petitioner] was sentenced to three consecutive terms of life in prison without the possibility of parole and ordered to pay fines and restitution.

People v. Souliotes, 2002 Cal. App. Unpub. LEXIS 7379, 1-3 (Cal. App. 5th Dist., Aug. 5,

---

[2] The NFPA "is an international nonprofit that now, among other things, promotes codes and standards 'intended to minimize the possibility and effects of fire and other risks.'" Schlesinger v. United States, 2012 U.S. Dist. LEXIS 15754, 3, 2012 WL 407098 (E.D.N.Y. Feb. 6, 2012) NFPA 921: Guide for Fire & Explosion Investigations "is widely accepted as the standard guide in the field of fire investigation." United States v. Hebshie, 754 F. Supp. 2d 89, 128 n.39 (D. Mass. 2010).

[3] The factual background is taken from the opinion of the state appellate court and is presumed correct. 28 U.S.C. § 2254(e)(1). However, as described at length below, many of the scientific findings regarding the cause of the fire and a chemical found at the fire scene and on Petitioner's shoes have been stipulated by the parties to have been incorrect.

1    2002).

2         **A.    Evidence and Argument Presented at First Trial**

3              1.    The Prosecution Case

4         At Petitioner's first trial ("trial one"), the prosecution presented fifty witnesses to

5    prove that Petitioner intentionally set fire to his rental home. The case against Petitioner

6    was based primarily on four categories of evidence: (1) expert scientific opinions that the

7    fire was intentionally set by Petitioner, (2) scientific evidence that Petitioner's shoes and

8    objects from the scene tested positive for medium petroleum distillates ("MPDs"), (3)

9    eyewitness Monica Sandoval's testimony that she saw Petitioner and his motor home at

10   the scene of the fire just before it started, and (4) evidence that Petitioner was in financial

11   duress and bore ill-will toward the Jones family and so had motive to destroy the home.

12              a.    Arson

13        At trial one, fire investigators from the Modesto County Fire Department testified

14   with certainty that the fire was caused by arson. They relied on several factors to support

15   their conclusion: the fire was described as being unusually hot; there were "pour patterns"

16   on the floor where flammable liquids had been poured and ignited; there was "deep

17   charring" on the walls; there was insufficient combustible material ("fuel load") in the house

18   to sustain such an intense fire unless an ignitable liquid, i.e., an accelerant, had been

19   added; a hand-held hydrocarbon detector indicated the presence of ignitable liquids at the

20   scene; and an eyewitness testified that a suspicious person had surreptitiously visited the

21   house just before the fire started. Based on this evidence, the primary fire investigator

22   testified at trial in his "opinion that this was a crude arson job and it's as obvious as an

23   elephant the patterns on the floor, the patterns in the overhead of this structure correlate

24   with each other. Liquids were poured throughout this house and ignited."[4] (RT 2053.)[5]

25   _____

26        [4] The expert also concluded as follows:

27   Q. To go back through this and wrap this up, from what you observed, not the theory, not the
     hypotheticals, but from what you observed in your trained expert opinion at that scene at
28   1319 Ronald, what do you believe was the cause of the fire?
     A. A liquid, ignitable liquid was poured throughout the living room, kitchen and into the garage

1

b.      MPD Evidence

2      At trial one, a state criminialist testified that MPDs were found on samples from the

3  fire scene and on Petitioner's shoes. MPDs are ignitable liquids including, but not limited

4  to, common household items such as charcoal lighter fluid, camp fuels, lamp oil, and paint

5  thinner.[6] (RT 3141.) This evidence created what the district attorney claimed was a very

6  strong physical link between Petitioner and the fire scene. In his closing argument, he

7  argued that finding MPDs at the fire scene was very unusual and that the presence of

8  MPDs on Petitioner's shoes was significant evidence upon which to find Petitioner guilty

9  of arson:

10             [T]here is no doubt, there is no reasonable doubt that this was an
       arson; and since it was an arson, someone had to enter. That someone
11     came in and that someone burned Michelle Jones, Daniel Jones and
       Amanda Jones; and that someone we know is the defendant, the person
12     with the reason, the opportunity, the person that had the disagreement with
       Michelle and wanted out of that house, the person that was identified for you
13     in court who had the chemical traces of that fire accelerant left on his shoes.

14  (RT 4291-92.)

15

c.      Sandoval's Eyewitness Testimony

16     At trial one, a neighbor, Monica Sandoval, described seeing a recreational vehicle

17

18

19

_____

20     and it was ignited.
       Q. And you've already told us that you won't opine as to what the ignition source was, but are
21     you still comfortable and certain in your opinion that this was this pour pattern that you've
       been describing, that accelerant that was used to set this fire?
22     A. Absolutely.
       Q. And do you have any doubt in your expert opinion that someone had to enter the living
23     room, the kitchen and the garage to pour that particular liquid?
       A. No doubt.

24  (RT 2268.)

25     [5] Throughout this Finding and Recommendation the Court shall refer to the transcript from the
26  evidentiary hearing of January 24-26, 2012 as "**HT**," the Reporter's Transcript on Appeal, lodged with the
    Court on December 20, 2011 as "**RT**," and the Clerk's Transcript on Appeal, lodged with the Court on
27  December 20, 2011 as "**CT**."

28     [6] There exist several categories of potential fuels including kerosene and light, medium, and
    heavy petroleum distillates. (RT 3130-31.) Gasoline is in its own class. (Id.)

or motor home[7] drive back and forth past the Ronald Avenue house ten to twenty times as she stood on her nearby apartment balcony during the early morning of the fire. On one occasion, the driver parked across from Petitioner's rental house, got out of the motor home and walked to the house carrying a white sack. The driver soon returned to the motor home without the sack. Large flames erupted from the residence soon after. Later, Sandoval identified Petitioner and his motor home as the person and vehicle she had seen that morning. (RT 1509, 5960-62.)

d.      Circumstantial Evidence

At trial one, the prosecution presented evidence to support a claim that Petitioner was motivated to commit the crime based on animus toward the Jones family. Daniel Jones and his family - his wife Michelle, and their children, six year old Daniel Junior and three year old Amanda - rented the house at 1319 Ronald Avenue in Modesto, California from Petitioner. On November 5, 1996, Jones notified Petitioner that he planned to move his family out of the house on December first. Jones testified that Petitioner did not show any sign of dissatisfaction with this news, and in fact seemed to understand Jones's economic reason for moving. (RT 1384.) Petitioner and Jones disagreed however on whether Jones had pre-paid his last month's rent. Petitioner presented Jones with a three-day "pay rent or quit" notice on the same day that Jones told Petitioner he was moving. (RT 1384-85.) As it turned out, while Jones intended to move out by December first, he was unable to do so until mid-January 1997. He had planned to move his family into a mobile home he had purchased. (RT 1373.) However, around the first of the year, heavy flooding occurred at the mobile home park and left Jones's home completely under water. (RT 1385-86.) Accordingly, the Joneses remained at the Ronald Avenue property past January 1, 1997.

The Joneses were scheduled to be locked out of the rental property on January 16, 1997. (RT 2396.) However, on January 13, 1997, the sheriff's office advised Petitioner's

---

[7] The Court shall hereinafter use the term "motor home" without distinction to generally describe recreational vehicles, motor homes, and related vehicles.

eviction agency that the writ of execution erroneously referenced Ronald "Street" rather than Ronald "Avenue." (RT 2396.) When told it likely would take a week to correct the error, Petitioner was upset, although not extraordinarily so. (RT 2404.) The eviction agency also was frustrated with the Sheriff's refusal to overlook the technical error. (RT 2407-08.)

Hope Warner, the manager of the mobile home park where the Joneses had been scheduled to move, testified that a day or two before the fire she had seen an angry exchange between the driver of a motor home and Ms. Jones, in the presence of one of her children, at the mobile home park. (RT 2687-88, 2694, 2738-42.) She identified the driver of the vehicle as Petitioner. (Id.)

The prosecution also presented evidence that Petitioner was in financial distress and wanted to rid himself of the rental property. Bertha Love, an employee at Petitioner's bank, testified that Petitioner called and came into the bank about a week before the fire to inquire about the bank taking back one of his three properties. (RT 2438-23.) Love claimed that Petitioner was "very irate" and that he "asked [her] to take back the keys" to his rental house. (Id.) Upon cross-examination, Love admitted her typewritten memorandum of the event said nothing about Petitioner being upset or irate. (RT 2447-48.) It simply reflected essential details of his request to voluntarily surrender a loan. (Id.) Love also refuted a police detective's statement that she had said that Petitioner had "thrown" his keys at her. (RT 2451.)

Banker Louis Bacigalupi, Love's supervisor, also met with Petitioner. He described Petitioner as "a little irritable, little upset about something," but otherwise engaged in a conversation about loan options. (RT 2971.) Bacigalupi was unable to answer Petitioner's questions and referred Petitioner to the loan service department. (RT 2972.)

Real estate broker Larry Titus contacted Petitioner after he learned from public records of the unlawful detainer action. (RT 2479-81.) In December 1996, Petitioner agreed to list the rental house for sale with Titus. (RT 2480-82.) Petitioner told Titus he was tired of not getting paid and with dealing with the rental. (RT 2482.) Titus discussed Petitioner's flexibility on sales price. (RT 2482-83.) Petitioner responded that he wanted to

sell the house and that he was amenable to adjusting the price downward if it was too high. (Id.)

At the time of the fire, Petitioner had identified a potentially interested buyer of the Ronald Avenue house. (RT 2381-82.) Petitioner had listed the property for sale for $89,950. (RT 2483.) That same month, Earl Linam, who had previously rented from Petitioner, approached him to negotiate a purchase. (RT 2382-83.) Linam had come up with a $4,000 down payment. (RT 2386.) Linam testified that Petitioner was willing to work with him and carry a mortgage on the property. (RT 2387, 2390.)

Michael Marks, an auditor with the United States Department of Treasury's Bureau of Alcohol, Tobacco and Firearms, examined Petitioner's financial records to evaluate his financial status at the time of the fire. (RT 2276-80.) According to him, as of January 15, 1997, Petitioner had assets worth about $394,000 and liabilities of about $209,000. (RT 2301-02.) Marks put Petitioner's monthly income at $2,609 and his monthly expenses at roughly $2,100; he noted Petitioner had $16,579 in liquid savings in the bank.[8] (RT 2303.) Marks also testified that Petitioner had a history of paying all his bills on time and leaving no balances on his credit cards. (RT 2325.) Petitioner's monthly mortgages on his properties totaled $1,504, not including taxes and insurance. (RT 7018-7020.) Marks did not believe that the Ronald Avenue house was over-insured. (RT 2356.)

Finally, the prosecution presented circumstantial evidence that Petitioner moved his unusual and distinctive motor home on the night of the fire. Daniel and Georgina Treece, Petitioner's neighbors, worked the night shift. (RT 1821-23; 1839.) When they went to work at 11:30 p.m. that night, they noticed Petitioner's motor home was parked on the street rather than in its ususal space in the driveway (Id.) The motor home was back in its usual spot when the Treeces returned around 8:30 a.m. the next morning. (Id.) Petitioner's neighbor, Helen Grant testified that Petitioner moved his motor home to the front curb

---

[8] About a month before the fire, Petitioner had extended a $30,000 loan secured by real property and so decreased his liquid assets in that amount. (RT 2297.) Petitioner was repaid the loan in May, 1997. (Id.)

1   sometime between 8:15 and 9:00 p.m. on the night of the fire. (RT 2366-67.) She also
2   noticed the motor home was back in the driveway the next morning. (Id.)

3          Steve Hamilton and Lisa Costley were perhaps the first to arrive at the scene and
4   see the fire. Hamilton instructed Costley to call 911, and he attempted to look into the
5   house. (RT 1581-84.) As Hamilton ran towards the fire, an automobile was parked in front
6   of 1319 Ronald Avenue with its lights out and the driver seemingly watching the fire. (RT
7   1604.) As Hamilton approached, the driver left. (Id.) Hamilton described the driver as a 25-
8   to-35-year-old Caucasian male with "longish light hair." (RT 1604, 6242-43.)

9          Another neighbor, Raul Ortega, was awakened by the fire and attempted to see if
10  anyone was in the house. (RT 1656-58.) As he approached the house he distinctly smelled
11  strong odors of gasoline. (Id.)

12         During trial, a Winnebago employee was called to testify regarding how very few
13  motor homes like Petitioner's were produced. (See RT 2148-49, 6837.) He said
14  Winnebago produced a total of 15,000 motor homes of that model, and 1,068 of those
15  were shipped to California. (Id.)

16         Neighbor Rebecca Lovecchio testified that she kept a brown striped Dodge motor
17  home on her property. (RT 2534-35.) Milton McEwen testified that he owned a motor home
18  like Petitioner's, but had not driven it in the part of town near the Ronald Avenue property
19  and did not start the fire. (RT 2903-04.)

20                           2.   The Defense

21         Trial counsel presented four expert witnesses in Petitioner's defense at trial one. He
22  called an expert in the field of engineering to rebut the testimony of the prosecution's fire
23  experts, a financial expert to explain that Petitioner was not in financial distress, a
24  psychologist to explain factors negatively affecting the reliability of Sandoval's
25  identifications, and a forensic psychologist to describe Michelle Jones unstable mental
26  health history. The experts' testimony is summarized below.

27                      a.   Fire Expert

28         Trial counsel called Dr. Donald J. Myronuk to refute the opinions of the prosecution's

fire experts. (RT 3469.) Myronuk testified at the first trial that the fire was likely caused by a natural gas leak from the kitchen stove. (RT 3480.) He attributed the leak to a brass flex hose which connected the stove to the gas line and which was known to be susceptible to corrosion by common kitchen chemicals.(RT 3570.) He opined that gas from a leak could have found a point of ignition from a nearby pilot light. (RT 3587.)

Based on his examination of the door between the kitchen and living room area and the garage, Myronuk testified that the fire traveled from the kitchen to the garage. (RT 3492-95, 3498-99.) He testified that benches, cabinets and a plywood partition wall in the garage provided significant fuel for the fire. (RT 3501-02.)

Myronuk explained that the patterns on the floor in the kitchen, living room, and garage were caused by falling tar, not a liquid accelerant. (RT 3484-85; 3513.) He also challenged the MPD evidence. He theorized that the MPDs on Petitioner's shoes were likely from shoe polish, laminate materials, or adhesives, while the MPDs in the living room were likely from melted polyurethane on the entertainment center or from audio and video components. (RT 3531.) Finally, Myronuk described an experiment he conducted to show that if the motor home had been driven on the night of the fire, its engine would have been noticeably warm to the touch when the police inspected it in the morning. (RT 3562-66.) Instead, the police found it cold to the touch. (RT 3565-66.)

b.    Eyewitness Reliability Expert

Dr. Elizabeth Loftus testified regarding the fallibility and suggestibility of eyewitness testimony. (See RT 3591-3573.) Loftus focused on factors that affected the retention of memory and explained that post-event information can supplement, distort, or contaminate a person's recollection. She ultimately concluded that "all the ingredients were present" for a hypothetical witness like Sandoval to be influenced by the post-event information presented to her. (RT 3611-12.) The fact that Sandoval saw Petitioner in a police line-up and at the preliminary examination prior to her identification of him could have influenced the reliability of her identification. (RT 3617-18.)

///

1

c.      Financial Expert

2     Petitioner's counsel presented a financial expert, Shazad Contractor, Certified Public

3 Accountant, who testified that Petitioner was not in financial distress at the time of the fire.

4 (RT 3349-51, 3354.) Contractor based his opinion upon a review of Petitioner's financial

5 history for the five years proceeding and including December 1996. (RT 3363.) Petitioner

6 was current, paid his bills automatically from his bank account each month, and had

7 significant cash reserves in the bank. (RT 3358, 3361-62.)

8

d.      Forensic Psychologist

9     Dr. Fred Rosenthal testified regarding victim Michelle Jones's psychiatric history.

10 (RT 3384-87.) Based on his review of Ms. Jones's medical, psychiatric, and autopsy

11 records, Rosenthal described Ms. Jones as a troubled individual with a long history of

12 emotional problems starting in childhood. (RT 3390-94.) He opined that she had the type

13 of difficult childhood that could lead to adult depression: she had been diagnosed with

14 cancer at an early age, had a below average IQ, was placed into foster care, had run away

15 from home, lived on the streets for some time, had a history of drug use, and had

16 previously attempted suicide. (RT 3394-95.) Rosenthal concluded that Ms. Jones's

17 psychiatric history reflected poor judgment and simplistic thinking. (RT 3397, 3401-02.)

18

e.      Lay Witnesses

19     At trial one, Petitioner presented several lay witnesses in addition to the above-

20 mentioned expert witnesses. Witnesses were called to show that Petitioner was not in

21 financial distress and did not appear hostile to the Joneses during the eviction process.

22 Other witnesses were called to show that there were flaws in the criminal investigation and

23 that the police failed to follow up on critical leads regarding other possible suspects. Trial

24 counsel presented several witnesses to challenge Hope Warner's credibility and to suggest

25 that there had been no trailer park altercation between Petitioner and Michelle Jones.

26 Finally, the defense presented witnesses to support the theory that the fire may have been

27 started by an unstable Ms. Jones attempting to use the stove to heat her house or perhaps

28 even to commit suicide.

### 3. Deliberation and Hung Jury

The jury deliberated for three days. During the first day of deliberation, it requested that several portions of testimony be read back. The jurors requested read-back of the testimony of Sandoval and the prosecution's fire experts. (RT 4298.) Specifically, they wanted to rehear portions of Sandoval's testimony regarding her observation and identification of the motor home and driver. (RT 4301.) They requested rereading of the county fire investigator's testimony about inspections of the stove and related connections. (Id.)

On the second day, the jury requested rereading of portions of the testimony of defense expert Myronuk regarding fire patterns on and around the door to the garage, the county fire investigator's testimony regarding the same, additional Sandoval testimony, and a police officer's testimony describing Sandoval's report of the motor home. (RT 4304-05.)

On the third day, the jury asked to rehear a state lab expert's MPD testimony and testimony regarding the results of the use of a hydrocarbon detector when searching Petitioner's house, belongings, and shoes. (RT 4307.) They also requested testimony about assault charges against Sandoval having been dropped and testimony of neighbors regarding movement of the motor home on the night of the fire. (RT 4308.)

The jury could not arrive at a unanimous decision. According to trial counsel, it was hung, eleven to one in favor of guilt. (Answer, Ex. D, Rien Decl. at 2.)

Petitioner's counsel, Timothy Rien applied for, and was granted, the right to defend Petitioner as a court appointed attorney at Petitioner's second trial. (RT 4319.)[9] Thus, Petitioner was represented by the same counsel at both trials.

### B. Evidence and Argument Presented at Second Trial

At Petitioner's second trial ("trial two"), the prosecution presented the same witnesses and evidence in its case-in-chief as it had at the first trial.

In his opening statement, defense counsel refuted the contentions of the

---

[9] The court also allowed Petitioner additional counsel under Keenan v. Superior Court, 31 Cal. 3d 424, 434 (1982). Rien was assisted by Harry Traback at the second trial.

1   prosecution and argued that the evidence would show that the fire was not arson, but
2   accidental, and that Petitioner was "factually innocent." (RT 5691-92, 5721.) In support, he
3   promised to present a fire expert, a forensic pathologist, and at least four lay witnesses.

4       However, once the prosecution rested, defense counsel did as well, calling no
5   witnesses. (RT 8935-36.)[10]

6       The jurors deliberated for a matter of hours and found Petitioner guilty on all counts.
7   He was sentenced to life without the possibility of parole.

8       **C.    Evidence Discovered After Trial**

9       In September 2005, Petitioner's sister contacted John Lentini, a criminalist, chemist,
10  and arson investigator, to see if there were any new developments in the testing of MPD
11  samples from Petitioner's case. Lentini had originally tested the samples for Petitioner but,
12  like the state criminalist, he concluded that both Petitioner's shoes and samples from the
13  fire tested positive for MPDs and that the MPDs in the samples could not be distinguished.
14  (See Pet., Exs. B-C, ECF No. 1.) Based on the inability to distinguish the samples, the
15  prosecution had argued at trial that the MPDs found on Petitioner's shoes could not be
16  excluded as having come from the same source of MPDs found in the samples from the
17  fire scene. (Id.)

18      However, after further research in 2005, Lentini was able to devise a method,
19  previously unknown to him and not described in scientific literature, for distinguishing
20  chemical differences between the MPDs in the samples from the fire scene and Petitioner's
21  shoes. (Id.) Using that method, he found that there was no chemical match between the
22  residue on Petitioner's shoes and the MPDs at the fire scene. (Id.) Petitioner sought relief
23  based on this new evidence.

24      Respondent, acknowledging the reliability of the new testing technique, stipulated:
25  "[T]he MPD on Petitioner's shoes is chemically distinguishable from the MPD found on the
26  carpet samples taken from the fire scene, and the MPDs did not originate from a common

27  _____

28      [10]The prosecution had allowed one defense witness to testify (about his efforts to buy Petitioner's rental property) during the state's case. (RT 7978.)

source," and "Detectable MPDs are commonly found on many household products and consumer goods, including the solvents in glues and adhesives used in floor coverings and footwear, residues of dry cleaning solvents, insecticides and cleaning agents." (See Joint Pretrial Statement, Undisputed Facts 13-14, ECF No. 108.)

Moreover, recognizing advances in fire science, Respondent stipulated that the opinions provided by the prosecution's arson experts at trial were no longer scientifically reliable and that modern techniques left the origin of the fire indeterminable, i.e., that it was just as likely the fire was accidental as that it was intentionally set: "The parties' experts all agree that they cannot determine the cause and origin of the fire based on the available evidence and record as it exists today, including whether the fire was accidental or the result of arson." (See Undisputed Fact 7.)

Continuing along these lines, the parties also stipulated that many of the factors relied upon by the experts to prove arson -- burn patterns, extreme heat of the fire, lack of other fuel -- were not in fact indicators of arson. (See Undisputed Fact 3.) Specifically, they agreed that the floor damage and burn patterns in the fire appeared to have resulted not from an accelerant, but from flashover burning[11] and the collapse of the roof; that fires involving liquid accelerants do not burn any hotter than other fires; that there was a sufficient fuel load in the house without the presence of a flammable liquid; and that hydrocarbon testers commonly give false positives, are only to be used for presumptive testing, and, standing alone, are never reliable evidence of the presence of a liquid accelerant. (See Undisputed Facts 4-10.)

**D.   Procedural History**

1.   State Court Proceedings

After he was convicted on October 20, 2000, Petitioner filed direct appeals with the California Court of Appeal, Fifth Appellate District, and the California Supreme Court; both

---

[11] Flashover occurs when the temperature of a structure fire becomes so intense that all combustible materials within that space ignite simultaneously. (See Expert Rpt. of Steven Carman, ECF No. 102-2.)

1  were denied. (See Abstract of Judgment, Lodged Docs. 1, 62, 66.)

2      Starting on December 10, 2003, Petitioner filed three petitions for writ of habeas

3  corpus in state court. In the petition filed with the Stanislaus County Superior Court, he

4  asserted claims of ineffective assistance of counsel. (Lodged Doc. 67.) On January 6,

5  2004, the Stanislaus County Superior Court denied the petition. (Lodged Doc. 68.)

6      Petitioner then filed a habeas petition with the Court of Appeal on March 1, 2004,

7  again raising claims of ineffective assistance of counsel. (Lodged Doc. 69.) The court

8  ordered the parties to informally respond to the petition and requested trial counsel file

9  declarations in response to the arguments presented in the petition. (Lodged Doc. 72.)

10 Both trial counsel filed declarations on June 1, 2004. (Id.) The petition was denied

11 summarily on August 26, 2004. (Lodged Doc. 73.) Petitioner filed a petition with California

12 Supreme Court on October 12, 2004, which summarily denied it on April 19, 2006. (Lodged

13 Docs. 74, 77.)

14              2.   Federal Habeas Proceedings

15     The present petition was filed on May 20, 2006. (Pet., ECF No. 1.)On May 29, 2007,

16 the Court ordered Respondent to file a response to the Petition. (Order, ECF No. 8.) On

17 July 27, 2007, Respondent filed a motion to dismiss the petition as untimely and for failure

18 to exhaust state remedies. (Mot. To Dismiss, ECF No. 17.)

19     On March 20, 2008, the District Court found the petition to be untimely under the

20 one year statute of limitations of AEDPA (28 U.S.C. § 2244(d)), did not decide the

21 exhaustion issue, and dismissed the petition. (Order, ECF No. 36.) Specifically, the Court

22 found that, even with the benefit of statutory tolling under 28 U.S.C. § 2244(d)(2) during

23 the time Petitioner filed his petitions for habeas corpus in state court, the present petition

24 was five days late. (Order at 6.) The Court further found that Petitioner was not entitled to

25 statutory tolling under 28 U.S.C. § 2244(d)(1)(D) based on the newly discovered evidence

26 distinguishing MPDs on Petitioner's shoes from those found at the fire scene; the Court

27 concluded Petitioner had not been sufficiently diligent in discovering that evidence. (Id. at

28 9.) Further, the Court denied Petitioner's actual innocence gateway claim (established

1    under Schlup v. Delo, 513 U.S. 298 (1995)) because the Ninth Circuit had not yet

2    determined if the gateway applied to a statue of limitations bar. (Order at 13.)

3                    3.    Ninth Circuit Decision and Relevant Findings

4           Petitioner appealed the order to the Ninth Circuit Court of Appeals. On September

5    20, 2010, it affirmed in part, reversed in part, and remanded the matter for further

6    adjudication. See Souliotes v. Evans, 622 F.3d 1173 (9th Cir. 2010). The Ninth Circuit

7    agreed that Petitioner had filed his federal habeas petition five days late and was not

8    entitled to equitable tolling. The Ninth Circuit, relying on its then-recent opinion in Lee v.

9    Lampert, 610 F.3d 1125, 1128-31 (9th Cir. 2010), also held that the Schlup 'actual

10   innocence gateway' did not apply to challenges of the AEDPA statute of limitations and

11   affirmed the lower court decision on such grounds. However, the Ninth Circuit held that the

12   District Court applied an inappropriately stringent standard regarding Petitioner's diligence

13   in presenting newly discovered evidence under 28 U.S.C. § 2244(d)(1)(D).

14          While the Ninth Circuit remanded the case to resolve the issue of diligence in

15   presenting newly discovered evidence, it held that the statutory tolling only applied to

16   Petitioner's substantive actual innocence claim. Souliotes, 622 F.3d at 1180. Additionally,

17   the Ninth Circuit ordered this Court to hold an "expedited hearing so that Souliotes, who

18   is now almost seventy years old, and who has been incarcerated since 1997, may have

19   an opportunity for meaningful review of his innocence claim." Id. at 1178 n.3.

20          On May 25, 2011, the Ninth Circuit issued a second order regarding Petitioner's

21   claims. At that time, the Ninth Circuit had voted to rehear Lee v. Lampert en banc, a case

22   with the potential to affect Petitioner's ability to present foreclosed claims in his petition.

23   Regardless, the Ninth Circuit again ordered this Court to conduct an expedited evidentiary

24   hearing regarding the newly discovered evidence. Souliotes v. Evans, 434 Fed. Appx. 660

25   (9th Cir. 2011). Given the explicit instruction of the Ninth Circuit, the Court scheduled an

26   August 23, 2011 evidentiary hearing to determine if Petitioner was diligent in presenting

27   the newly discovered evidence. (Min. Order, ECF No. 63.)

28          On August 2, 2011, the Ninth Circuit revisited Lee v. Lampert, and in an *en banc*

decision overturned the decision of the three judge panel. See Lee v. Lampert, 653 F.3d 929 (9th Cir. 2011) (en banc). The Ninth Circuit held "that a credible claim of actual innocence constitutes an equitable exception to AEDPA's limitations period, and a petitioner who makes such a showing may pass through the Schlup gateway and have his otherwise time-barred claims heard on the merits." Id. at 931-32.[12] Two weeks later, on August 17, 2011, the Ninth Circuit vacated its decision in Souliotes and issued the following order:

> In light of the intervening en banc decision in Lee v. Lampert, 653 F.3d 929, (9th Cir. 2011) (en banc), we vacate our opinion in Souliotes v. Evans, 622 F.3d 1173 (9th Cir. 2010), reverse the district court's dismissal of Souliotes's habeas petition as untimely, and remand for proceedings consistent with Lee. We also vacate our order of limited remand issued on May 25, 2011, with the understanding that the district court will conduct whatever proceedings are necessary, in an expedited manner, to determine whether any of Souliotes's habeas claims may be addressed on the merits.

Souliotes v. Evans, 654 F.3d 902 (9th Cir. 2011).

In light of the August 17, 2011 order, the Court vacated the limited evidentiary hearing set for August 23, 2011 and instead scheduled an evidentiary hearing to hear Petitioner's actual innocence gateway claim under Schlup. A three day evidentiary hearing commenced on January 24, 2012. On April 24, 2012, after the hearing and appropriate briefing from the parties, the Magistrate Judge issued findings and a recommendation that the Court find that Petitioner presented a sufficient showing of actual innocence to serve as an equitable exception to the AEDPA statute of limitations. On July 6, 2012 the Court adopted the findings and recommendation of the Magistrate Judge and found Petitioner actually innocent under Schlup. Specifically, the District Court found that considering all of the evidence, including the new state of the scientific evidence, Petitioner was actually innocent and that "no reasonable juror would [have found Petitioner] guilty beyond a reasonable doubt." House v. Bell, 547 U.S. 518, 538 (2006).

As Petitioner was equitably excepted from the statute of limitations, the Court

[12] In Perkins v. McQuggin (Supreme Court Case No. 12-126), the Supreme Court shall address this term whether "a credible claim of actual innocence [is] a valid basis for equitably tolling the AEDPA statute of limitations."

-18-

ordered the parties to respond to the merits of Petitioner's first amended petition for writ of habeas corpus. (ECF No. 151.) On October 5, 2012, Respondent filed an answer to the petition. (ECF No. 166.) On November 6, 2012, Petitioner filed a traverse. (ECF No. 169.) On February 1, 2013, the Court provided the parties an opportunity to request an evidentiary hearing to present additional testimony regarding the merits of Petitioner's ineffective assistance of counsel claims. (ECF No. 171.) The parties declined the request. (ECF Nos. 172-73.) Accordingly, the petition stands ready for adjudication.

## IV.   PETITIONER'S CLAIMS

The Court addresses Petitioner's claims in the order presented in his traverse.[13]

### A.   Claim One: Due Process Violation Based on Unreliable Testimony

#### 1.   Summary of Argument

At trial the prosecution presented scientific evidence regarding the fire including expert opinion that there was conclusive evidence of arson caused by a flammable liquid, that MPDs were present at the fire scene and on Petitioner's shoes, and that positive results from a hydrocarbon detector indicated that a liquid accelerant was present at the fire scene and on Petitioner's shoes and clothing. (Am. Pet. ¶¶ 128-30, ECF No. 151.) The parties have since stipulated that the above statements are not scientifically accurate. (See Joint Pretrial Statement, Undisputed Facts 2-14, ECF No. 108; Findings and Recommendation Regarding Statute of Limitations Issues ("Limitations F&R"), ECF No. 141.)

Petitioner asserts that his conviction was predicated on what science now shows was fundamentally unreliable evidence and amounted to the presentation of false evidence by the prosecution. He argues that the admission of the false testimony "so infected Petitioner's trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986).

#### 2.   Relevant Facts

At both trials, the prosecution presented several experts who testified that the fire

---

[13] In his traverse, Petitioner addressed his claims in an order different from that in his petition. The Court follows the order in the traverse. The instant claim appeared as claim six in the amended petition.

1    was intentionally set.

2                                    a.      Fire Cause and Origin Testimony

3          Fire investigators from the Modesto County Fire Department testified with certainty

4    that the fire was caused by arson. They relied on several factors to support their conclusion:

5    The fire was described as being unusually hot; there were "pour patterns" on the floor where

6    flammable liquids obviously had been poured and ignited; there was "deep charring" on the

7    walls; there was insufficient combustible material ("fuel load") in the house to sustain such

8    an intense fire unless an ignitable liquid, i.e., an accelerant, had been added; a hand-held

9    hydrocarbon detector indicated the presence of ignitable liquids at the scene; and the

10   eyewitness testified that a suspicious person had surreptitiously visited the house just

11   before the fire started. Based on this evidence, the primary fire investigator testified at trial

12   that he had "no doubt . . . that this was an arson fire" involving an ignitable liquid, and "[t]he

13   ignition device was a human hand." (RT 6722, 6957.)

14                                   b.      MPD Testimony

15         Sarah Yoshida, a Department of Justice criminalist, testified as to her examination

16   of fire debris samples collected from the scene and Petitioner's shoes. (RT 8884-85.) She

17   found that two samples from the fire scene tested positive for MPDs as did Petitioner's

18   shoes. (RT 8860, 8864-65, 8874-78, 8883-84.)

19         Yoshida acknowledged scientific literature reflecting that some shoes contained

20   materials producing patterns identified as petroleum distillates. (RT 8886-87.) She also

21   explained that the presence of an MPD did not necessarily indicate its use to start the fire.

22   (RT 8888.) While admitting that she could not identify the particular substance detected in

23   each sample and that the MPDs could be from any number of substances, Yoshida

24   described a clear correlation between the shoe and fire scene samples: all contained MPDs.

25   (RT 8923-24.) She also pointed out that in her eight years of conducting arson analyses she

26   had only rarely found MPDs. (RT 8895.)

27         The government emphasized what it clearly believed was the highly probative value

28   of the MPD evidence. In discussing other evidence, the government returned to the shoes

                                              -20-

as proof that its theory was correct. Thus, commenting on inconsistencies in eye witness

testimony, the prosecutor argued:

> The most conclusive scientific evidence, on his shoes from wearing that morning, medium petroleum distillates. What set the fire? Medium petroleum distillates. Maybe Monica, you know, you're thinking Monica's not completely certain, but the person she said it was is the person who has that stuff on his shoes . . .

(RT 9049, 9250.) In closing, based on the above MPD evidence, the prosecution reminded

the jury that MPDs had been found both on Petitioner's shoes and at the fire scene and

argued:

> [T]he finger of guilt points to the defendant. Doesn't point to the one armed man. It points to George Souliotes because he's the one. The shoes tell the tale.

(RT 9050.)

During the course of the present proceedings, Respondent conceded: "The MPD on

Petitioner's shoes is chemically distinguishable from the MPD found on the carpet samples

taken from the fire scene and the MPDs did not originate from a common source."

(Undisputed Fact 13.)

c.    Hydrocarbon Detector

The investigators also described using a hand-held "hydrocarbon detector" to search

the fire scene for traces of ignitable liquid and reported that the detector gave positive

reactions which constituted further evidence that a liquid accelerant had been used. (See,

e.g., RT 6574:19-6576:6, 6627:1-6, 6763:20-6766:28, 8485:25-8488:11.) During trial the

fire investigator admitted that the positive reactions afforded a significant basis for obtaining

a search warrant. (RT 6764.) On cross-examination, the fire investigator made it clear that

he found positive reactions from the detector as compelling evidence of arson. (RT 2125-

26.) The expert reached his opinion regarding arson before lab results of samples of

positive results from the detector were tested. Regardless, the fact that the samples tested

negative for accelerants did not affect his opinion:

> Q. Well, the fact is, let's get back to your compelling evidence. So what you're saying is that even though the lab said that those particular things were negative for a flammable or combustible material, that that wouldn't change

your opinion, because the detector picked it up. Is that right?

A. I didn't say that it wouldn't change my opinion. I'm saying that my report was based on the fact that the detector sounded, keyed for those things. So what the lab did later on, this report was written before we had any results from the lab. It was based on the fact that the detector keyed on those locations.

Q. Well, then when the lab report came back did you take this report back and say, well, it isn't as compelling as I thought it was?

A. I don't believe I mentioned anything in here about lab results.

Q. I know. Because you didn't wait for them. Right?

A. I think I explained to you earlier. My involvement in this investigation was a fire scene and the writing of the report a few days later and it was submitted to the detectives. There -- that's it. And information has come since then in the preliminary and the trial. I mean at the time I wrote the report based on the information and the facts that I had.

Q. Doesn't that effect your testimony now, here, three years later?

A. Well, the fact is that the detector did key on those articles and those locations. So it wouldn't change that.

Q. You keep saying that.

A. Because that's the fact.

Q. I know that is a fact. I accept that. I have no problem with that.

A. Okay.

Q. The fact that a lab analyzed those things and didn't find what you were looking for, does that effect your opinion at all now?

A. I don't -- you know, I never read the lab report on those articles, to tell you the truth. I don't know how that came back.

(RT 6748-52.)

Respondent has now conceded that the hydrocarbon detector is not a reliable indicator of the presence of an accelerant. "[H]ydrocarbon detectors commonly deliver false positives," and "a positive reaction from a hydrocarbon detector is never reliable evidence of the presence of a liquid accelerant without confirmatory lab results." (Undisputed Facts 9, 10.)

3.    Applicable Law

The Supreme Court has held that the Constitution "protects a defendant against a

-22-

conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." Perry v. New Hampshire, 132 S. Ct. 716, 723 (2012). Constitutional safeguards such as the right to counsel and confrontation of witnesses serve to allow a defendant to challenge the reliability and credibility of evidence produced at trial. Id. "Only when evidence is so extremely unfair that its admission violates fundamental conceptions of justice," has the Supreme Court "imposed a constraint tied to the Due Process Clause." Id. (internal citations omitted).

The Supreme Court has held that the presentation of knowingly false evidence by the prosecution is a violation of Due Process. See Napue v. Illinois, 360 U.S. 264, 269 (1959) ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.") "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Id.; see also United States v. Agurs, 427 U.S. 97, 103 (1976) (stating that "the Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair.").

"A claim under Napue will succeed when (1) the testimony or evidence was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material." Sivak v. Hardison, 658 F.3d 898, 908-909 (9th Cir. 2011) (internal citations omitted). Further, "[i]t is 'irrelevant' whether the defense knew about the false testimony and failed to object or cross-examine the witness, because defendants 'c[an] not waive the freestanding ethical and constitutional obligation of the prosecutor as a representative of the government to protect the integrity of the court and the criminal justice system.'" Id. (citing N. Mariana Islands v. Bowie, 243 F.3d 1109, 1122 (9th Cir. 2001).

A new trial is not automatically required when false evidence is discovered. Rather, a constitutional error resulting from the use of false evidence by the government requires a new trial, "if the false testimony could . . . in any reasonable likelihood have affected the

1   judgment of the jury." Giglio v. United States, 405 U.S. 150, 154 (1972) (quoting Napue, 360

2   U.S. at 271); see also United States v. Inzunza, 638 F.3d 1006, 1020 (9th Cir. 2011) ("[A]

3   defendant is entitled to a new trial if there is a reasonable probability that without the

4   evidence the result of the proceeding would have been different.") (quoting United States

5   v. Young, 17 F.3d 1201, 1204 (9th Cir. 1994). The Supreme Court has explained that the

6   basis for relief is not based on "prosecutorial misconduct, but more importantly because

7   they involve a corruption of the truth-seeking function of the trial process." United States v.

8   Agurs, 427 U.S. 97, 103-104 (1976).

9                    4.    Analysis and Conclusion Regarding Due Process Claim

10          Even assuming that the fire evidence at trial was false and prejudicial to Petitioner,

11   he is not entitled to relief on that basis alone. While the Ninth Circuit has held that

12   intentional falsity is not required, this Court is bound to grant relief based only on clearly

13   established Supreme Court law. See 28 U.S.C. § 2254 (a), (d)(1).

14          Specifically, the Ninth Circuit has allowed relief based on false testimony regardless

15   of knowledge of its falsity. See Maxwell v. Roe, 628 F.3d 486, 499-500 (9th Cir. 2010);

16   Killian v. Poole, 282 F.3d 1204 (9th Cir. 2002).

17                    "[A] government's assurances that false evidence was presented in
                 good faith are little comfort to a criminal defendant wrongly convicted on the
18               basis of such evidence. A conviction based in part on false evidence, even
                 false evidence presented in good faith, hardly comports with fundamental
19               fairness. Thus, even if the government unwittingly presents false evidence,
                 a defendant is entitled to a new trial "if there is a reasonable probability that
20               [without the evidence] the result of the proceeding would have been different."

21   United States v. Young, 17 F.3d 1201, 1203-1204 (9th Cir. 1994); see also Killian, 282 F.3d

22   at 1209.

23          The Supreme Court, however, requires the knowing presentation of false evidence.

24          Other district courts have denied relief when faced with claims based on the Ninth

25   Circuit standard. See Farnese v. Schwartz, 2008 U.S. Dist. LEXIS 38238, 12-13, 2008 WL

26   2025104 (E.D. Cal. May 9, 2008) ("Given the Supreme Court's silence and the Ninth

27   Circuit's inconsistent treatment of good faith use of perjured testimony, we must conclude

28   that federal law is not clearly established with regard to the unwitting use by the prosecution

1  of perjured testimony."). In Skains v. Yates, the district court held that the Ninth Circuit

2  decision in "Young does not suffice for established Supreme Court authority." 2008 U.S.

3  Dist. LEXIS 92955, 34-34, 2008 WL 2682512 (E.D. Cal. June 30, 2008) ("Two district courts

4  have reached this conclusion as well."); see also Lin v. Walker, 2004 U.S. Dist. LEXIS

5  29312, 70-72 (E.D.N.Y. July 28, 2004) ("This Court cannot rely on Young to extend the

6  Supreme Court's reasoning even further.").

7       It is unclear why false evidence, whether presented in good faith and without

8  knowledge to its falsity, does not afford a basis for relief under Supreme Court law due to

9  its "corruption of the truth-seeking function of the trial process."[14] Agurs, 427 U.S. at 104.

10 The Supreme Court has described the "corruption of the truth-seeking function" as a more

11 important rationale to prohibit false evidence than to deter prosecutorial misconduct. Agurs,

12 427 U.S. at 104. However, "[i]f [the Supreme Court's] concern is with the integrity of the

13 evidence that the government utilizes to prove its case, the rationale is not a persuasive

14 basis for treating perjured testimony differently from other types of prosecutorial

15 suppression." Prosecutorial Intent in Constitutional Criminal Procedure, Steven Alan Reiss,

16 135 U. Pa. L. Rev. 1365, 1402 (1987). Regardless of the intent or rationale of the Supreme

17 Court, this Court is bound by its precedents, and they require that "the prosecution knew

18 or should have known that the testimony was actually false." Sivak, 658 F.3d at 908-909

19 (9th Cir. 2011); Napue, 360 U.S. at 269.

20      In this case, the Court has previously determined that without the testimony of the

21 prosecution's experts, now stipulated to be scientifically unreliable, there was not sufficient

22 evidence to convict Petitioner. (Limitations F&R at 92.) However, the fact that the evidence

23 was false and prejudicial without more is insufficient under Napue and its progeny to entitle

24 Petitioner to federal habeas relief. Petitioner's reliance on Ninth Circuit authority is

25

26      [14] In dissent, Justice Stevens noted that the four dissenting justices in Durley v. Mayo, 351 U.S.
   277(1956), would find a clear due process violation regardless whether the state was aware of the falsity
27 of the statement. Jacobs v. Scott, 513 U.S. 1067, 1069-70 (1995) (Stevens, J., dissenting). On the other
   hand, Justice Scalia has commented that the Ninth Circuit has "stretched the Constitution," and that the
28 Supreme Court has "never held that, and [is] unlikely to ever do so." Cash v. Maxwell, 132 S.Ct. 611, 615
   (2012) (Scalia, J., dissenting).

misplaced. This Court cannot rely on <u>Young</u> and other Ninth Circuit cases to grant federal habeas relief.

Petitioner is not, however, foreclosed from relief. Petitioner may still be entitled relief if he can show that the prosecution knew or should have known that the fire evidence presented at trial was false. Neither party has briefed the Court on that particular issue. The claim is not ready for adjudication. The Court reserves judgment on it.

**B.    Claims Two, Three, and Seven: Ineffective Assistance Based on Failure to Call Expert and Lay Witnesses**

1.    Summary of Argument

Petitioner presents several claims of ineffective assistance of counsel. Claim two alleges that counsel was ineffective for failing to present an arson expert at trial. Claim three alleges that counsel was ineffective for failing to present other defense witnesses at trial. The claims relate to the same core, operative facts, namely the failure of trial counsel to present a defense despite promising the jury he would so in his opening statement. These claims were presented as one combined claim in state court. (See Points & Authorities to Second Amended California Supreme Court Petition, Lodged Doc. 74 at 46-82.) The resulting state court decision reviewed and denied both claims at the same time. Since the claims involve the same conduct and relevant state decisions, the Court shall address each and then the cumulative prejudicial effect, if any, of the issues raised.[15]

2.    Exhaustion of Claims

Petitioner presented the claims of ineffective assistance of counsel for failure to call both expert and lay witnesses in his second amended petition for writ of habeas corpus with the California Supreme Court. Specifically, Petitioner raised a claim for ineffective assistance of counsel for failure to present an arson expert, an expert on eyewitness fallibility, an expert on Michelle Jones's unstable psychiatric history, and lay witnesses to refute claims that Petitioner was in financial distress and harbored ill-will towards the

---

[15] Petitioner's seventh claim of the petition is for cumulative error. Petitioner has not limited the cumulative error claim to just claims two and three. However for reasons that will become apparent, for the present inquiry, the Court shall only consider the cumulative effect of claims two and three.

Joneses. (Lodged Doc. 74 at 46-82.) In the claim, Petitioner described how counsel's failure

to follow through on promises to present witnesses made during his opening statement

harmed the credibility of trial counsel and Petitioner and angered the jurors. (Id. at 48-54.)

Petitioner also alleged that the cumulative effect of telling the jury defense witnesses would

be called and then failing to call them deprived Petitioner of a defense and constituted

ineffective assistance of counsel. (Id. at 81-82.) The California Supreme Court denied the

petition in a silent decision. (Lodged Doc. 77.) As the highest state court adjudicated the

claims, they are properly exhausted and ripe for federal review. 28 U.S.C. § 2254(b)(1);

Duncan v. Henry, 513 U.S. 364, 365 (1995). Petitioner has raised identical issues in claims

two, three and seven of the First Amended Petition. (ECF No. 151 at 9-27, 33-34.)

### 3.   Legal Standard of Review

On April 24, 1996, Congress enacted AEDPA, which applies to all petitions for writ

of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 326 (1997);

Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after

the enactment of AEDPA, and so it is governed by its provisions.

Under AEDPA, an application for a writ of habeas corpus by a person in custody

under a judgment of a state court may be granted only for violations of the Constitution or

laws of the United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n. 7

(2000). Federal habeas corpus relief is available for any claim decided on the merits in state

court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

### a.   Contrary to or an Unreasonable Application of Federal Law

In determining whether a state court decision was "contrary to" or involved "an

unreasonable application of" Supreme Court precedent, the Supreme Court has explained

1  that:

> A state-court decision is contrary to this Court's clearly established precedents if it applies a rule that contradicts the governing law set forth in our cases, or if it confronts a set of facts that is materially indistinguishable from a decision of this Court but reaches a different result. A state-court decision involves an unreasonable application of this Court's clearly established precedents if the state court applies this Court's precedents to the facts in an objectively unreasonable manner.

Brown v. Payton, 544 U.S. 133, 141 (2005) (internal citations omitted); Premo v. Moore, 131 S. Ct. 733, 743 (2011); Jackson v. Nevada, 688 F.3d 1091, 1096 (9th Cir. 2012). "As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 131 S. Ct. 770, 786-787 (2011).

However, "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced. The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner." Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted); Musladin v. Lamarque, 555 F.3d 830, 839 (9th Cir. 2009).

For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70 71 (2003). A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id. at 75-76 (quoting Williams, 529 U.S. at 409-10); Woodford v. Visciotti, 537 U.S. 19, 24 25 (2002). In Harrington v. Richter, the Supreme Court further stressed that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011) (citing Williams, 529 U.S. at 410) (emphasis in original). "A state court's determination that a claim lacks merit

precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786 (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case by case determinations." Id.; Renico v. Lett, 130 S. Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. 111, 122 (2009) (quoting Richter, 131 S. Ct. at 786).

b.      Review of State Decisions

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). This is referred to as the "look through" presumption. Id. at 804; Johnson v. Williams, No. 11-465, 2013 U.S. LEXIS 1610, 14 n.1 (U.S. Feb. 20, 2013); Cannedy v. Adams, 2013 U.S. App. LEXIS 2646, 23-24 (9th Cir. Cal. Feb. 7, 2013) ("[I]t is a common practice of the federal courts to examine the last reasoned state decision to determine whether a state-court decision is "contrary to" or "an unreasonable application of" clearly established federal law;" and "it [is] unlikely that the Supreme Court intended to disrupt this practice without making its intention clear.").

Richter instructs that when the state court decision is not reasoned and explained, but instead a summary denial, then: "Under § 2254(d), a habeas court must determine what arguments or theories... could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786; Cannedy, 2013 U.S. App. LEXIS 2646, 22 (citing Woolley v. Rednour, 702 F.3d 411, 422 (7th Cir. Ill. 2012) ("By its terms, Harrington applies where a state court's decision is unaccompanied by an explanation . . .")).

"[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. at 75). AEDPA "preserves

-29-

authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." Id. To put it yet another way:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 786 87. The Court based its rationale on the fact "that state courts are the principal forum for asserting constitutional challenges to state convictions." Id. at 787. It follows from this consideration that § 2254(d) "complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for later federal habeas proceedings." Id. (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977)).

    4.    Is the State Court Decision Contrary to or an Unreasonable Application of Supreme Court Law?

In his writ of habeas corpus filed before the Stanislaus County Superior Court on December 10, 2003, Petitioner raised claims of ineffective assistance of counsel based on defense counsel's failure to call expert and lay witnesses, most notably the failure to present an arson expert to rebut the testimony of the prosecution's arson expert. (Lodged Doc. 67 at 2-3.) On January 8, 2004, the California Superior Court denied the petition. (Lodged Doc. 68.) The decision denying Petitioner's claim held, in its entirety:

> The petition fails to show that appeal is inadequate.
>
> A petition for habeas corpus can't be used to second guess trial attorneys strategy during the trial.
>
> To grant the petition the Court would have to accept, as factually correct, all of petitioner's allegations and disregard all the facts proved in the trial.
>
> The Petition for Writ of Habeas Corpus is DENIED.

(Id.)

Petitioner proceeded to file petitions for writ of habeas corpus with the California

Court of Appeal and the California Supreme Court.[16] (Lodged Docs. 69, 74.) Both courts, without an evidentiary hearing or order to show cause, summarily denied Petitioner's ineffective assistance of counsel claim for failing to present witnesses. (Lodged Docs. 73, 77.) Accordingly, this Court must look thorough the silent decisions of the California Court of Appeal and the California Supreme Court and determine if the state court decision described above is contrary to or an unreasonable application of clearly established federal law. See Ylst v. Nunnemaker, 501 U.S. 806; Johnson v. Williams, No. 11-405, 6 n.1; Cannedy, 2013 U.S. App. LEXIS 2646 at 22-24.

Due to the brevity of the state court decision, the Court shall review each sentence to determine if the state court's findings are squarely "contrary to … clearly established federal law," or suffer from an "error well understood and comprehended in existing law beyond any possibility of fair-minded disagreement." Richter, 131 S. Ct. 770, 787 (2011).

a.   First Sentence

First, the state court denied Petitioner's claim on the grounds that he "fail[ed] to show that appeal is inadequate." No such requirement exists. This statement is contrary to clearly established federal law.

Under California law, a petition for habeas corpus is the preferred method for bringing an ineffective assistance of counsel claim because such a claim requires consideration of evidence outside the trial record. People v. Salcido, 44 Cal. 4th 93, 171 (2008) ("claims of ineffective-assistance of counsel generally must be raised in a petition for writ of habeas corpus based on matters outside the record on appeal"); People v. Mendoza Tello, 15 Cal. 4th 264, 267 (1997) ("Because claims of ineffective assistance are often more appropriately litigated in a habeas corpus proceeding, the rules generally prohibiting raising an issue on habeas corpus that was, or could have been, raised on appeal would not bar an ineffective assistance claim on habeas corpus.") (citations omitted).

---

[16] Petitioner twice amended his petition with the California Supreme Court to add additional claims but maintained his claims for ineffective assistance of counsel throughout his state collateral appeals. (See Lodged Doc. 74.)

1    Federal law does not require that a petitioner show that direct appeal is inadequate

2 in order to proceed to seek review of claims originally brought by collateral appeal in state

3 court. Like the state courts, federal courts also prefer claims of ineffective assistance of

4 counsel to be brought by way of collateral appeal rather than direct appeal. Massaro v.

5 United States, 538 U.S. 500, 504-505 (2003) ("[i]n most cases a motion brought under §

6 2255 is preferable to direct appeal for deciding claims of ineffective-assistance. When an

7 ineffective-assistance claim is brought on direct appeal, appellate counsel and the court

8 must proceed on a trial record not developed precisely for the object of litigating or

9 preserving the claim and thus often incomplete or inadequate for this purpose.") The Ninth

10 Circuit has "recognized two extraordinary exceptions" to the general rule that ineffective

11 assistance claims are to be reviewed on collateral appeal, i.e., in the "unusual cases" where

12 the record on appeal is sufficiently developed or the legal representation is obviously

13 inadequate. United States v. Jeronimo, 398 F.3d 1149, 1156 (9th Cir. 2005).

14    The state court's statement clearly does not address the merits of Petitioner's claims.

15 It may have been referring to the application of state procedural rules. Nevertheless, upon

16 federal review, this court is concerned only with whether the claims were properly exhausted

17 or procedurally defaulted. See e.g. 28 U.S.C. § 2254(b); Coleman v. Thompson, 501 U.S.

18 722, 729-30 (1991). Respondent has not asserted that the state court's statement served

19 to procedurally bar Petitioner's claims of ineffective assistance of counsel, and this Court

20 is not aware of any state court ground that would form a basis for such a bar. To the extent

21 that the state court denied Petitioner's claim on this ground, the state court decision was

22 contrary to or an unreasonable application of federal law.

23             b.    Second Sentence

24    The state court's second statement that "[a] petition for habeas corpus can't be used

25 to second guess trial attorneys strategy during the trial" is contrary to clearly established

26 federal law.

27    As no evidence has been presented to the contrary, the Court shall presume that the

28 state court's decision adjudicated Petitioner's federal claim on the merits. See Johnson v.

1   Williams, 2013 U.S. LEXIS 1610, 21. ("When a state court rejects a federal claim without

2   expressly addressing that claim, a federal habeas court must presume that the federal claim

3   was adjudicated on the merits—but that presumption can in some limited circumstances be

4   rebutted.")

5          The statement is contrary to the clearly established standard required to adjudicate

6   any ineffective assistance of counsel claim. See Strickland v. Washington, 466 U.S. 668

7   (1984).[17] Under Strickland, Petitioner must show that "counsel's representation fell below

8   an objective standard of reasonableness" and that there is "a reasonable probability that,

9   but for counsel's unprofessional errors, the result of the proceeding would have been

10  different." Id. at 688, 694; Harrington v. Richter, 131 S. Ct. 770, 787 (2011). "Even under

11  de novo review, the standard for judging counsel's representation is a most deferential one."

12  Id. 788. While deference is to be afforded to strategic decisions of counsel, under

13  Strickland, reviewing courts must still determine if strategic choices were objectively

14  reasonable. Strickland, 466 U.S. at 681. "Those strategic choices about which lines of

15  defense to pursue are owed deference commensurate with the reasonableness of the

16  professional judgments on which they are based." Id.

17         Here, the state court explained that "[a] petition for habeas corpus can't be used to

18  second guess trial attorneys strategy during the trial." This statement reflects a belief that

19  the state court lacked authority on habeas review to adjudicate questions of strategy of

20  counsel. If the court felt it could not review questions of strategy, then it necessarily failed

21  to determine if counsel's strategy fell below an objective standard of reasonableness. "The

22  relevant question is not whether counsel's choices were strategic, but whether they were

23  reasonable." Roe v. Flores-Ortega, 528 U.S. 470, 481 (2000).

24         In Strickland, the Supreme Court explained that there is a strong presumption that

25  trial counsel's decisions are reasonable. 466 U.S. at 689. ("Because of the difficulties

26

27         [17] "It is past question that the rule set forth in Strickland qualifies as 'clearly established Federal
28  law, as determined by the Supreme Court of the United States.'" Williams v. Taylor, 529 U.S. 362, 391
    (2000).

-33-

1   inherent in making the evaluation, a court must indulge a strong presumption that counsel's

2   conduct falls within the wide range of reasonable professional assistance; that is, the

3   defendant must overcome the presumption that, under the circumstances, the challenged

4   action might be considered sound trial strategy.") (citation omitted). But implicit in the need

5   for a presumption of reasonableness is the fact that lower courts can, and indeed must,

6   review trial counsel's strategic choices to determine if they are reasonable. "[A] poor tactical

7   decision may constitute deficient conduct if the defendant [can] overcome the presumption

8   that, under the circumstances, the challenged action [or lack of action] might be considered

9   sound trial strategy." Reynoso v. Giurbino, 462 F.3d 1099, 1113 (9th Cir. 2003) (quoting

10  Strickland, 466 U.S. at 689).

11       The Supreme Court has routinely found that decisions of state courts that fail to

12  properly apply the Strickland ineffective assistance of counsel standard are contrary to

13  clearly established federal law under AEDPA. See Lafler v. Cooper, 132 S. Ct. 1376, 1390

14  (2012) ("By failing to apply Strickland to assess the ineffective assistance of counsel claim

15  [Petitioner] raised, the state court's adjudication was contrary to clearly established federal

16  law.") In Lafler, the Supreme Court granted an ineffective assistance of counsel claim under

17  AEDPA deference where a state court denied the claim because it found that petitioner's

18  rejection of a plea deal "was knowing and voluntary" and did not apply proper Strickland

19  analysis to counsel's advice to reject the plea. 132 S. Ct. at 1390. The Supreme Court also

20  found that the Virginia Supreme Court's analysis of an ineffective assistance of counsel

21  claim "was thus not only 'contrary to,' but also, inasmuch as the Virginia Supreme Court

22  relied on the inapplicable exception recognized in Lockhart, an 'unreasonable application

23  of' the clear law as established by this Court." Williams v. Taylor, 529 U.S. 362, 391, 397

24  (2000) ("The Virginia Supreme Court erred in holding that our decision in Lockhart v.

25  Fretwell, 506 U.S. 364, 122 L. Ed. 2d 180, 113 S. Ct. 838 (1993), modified or in some way

26  supplanted the rule set down in Strickland.").

27       As the state court here determined it could not review the reasonableness of

28  counsel's strategic choices, the decision was contrary to and an unreasonable application

1  of Supreme Court law. No fairminded jurist would find the state court decision correct.

2      Respondent offers nothing to explain how the state decision could be considered a

3  reasonable application of Supreme Court law. Instead he assumes that the state court

4  properly applied Strickland and denied the claim on a finding that counsel's conduct was

5  reasonable and not prejudicial to Petitioner. (Answer at 16-34.) The Supreme Court recently

6  stated that "[u]nder § 2254(d), a habeas court must determine what arguments or theories

7  . . . could have supported, the state court's decision; then it must ask whether it is possible

8  fairminded jurists could disagree that those arguments or theories are inconsistent with the

9  holding in a prior decision of this Court." Richter, 131 S. Ct. at 786. While Richter allows

10  courts to rely on supposition to determine if unreasoned state decisions are contrary to

11  Supreme Court law, this Court is unwilling to extend Richter to allow courts to subvert the

12  plain meaning of the state court decision. See Cannedy, 2013 U.S. App. LEXIS 2646, 22

13  ("[I]t does not follow from Richter that, when there is a reasoned decision by a lower state

14  court, a federal habeas court may no longer "look through" a higher state court's summary

15  denial to the reasoning of the lower state court.").

16      The state court held that it could not, and therefore did not, review questions of

17  strategy. This Court is bound to the plain meaning of the state court decision. To the extent

18  that Respondent contends that the state court decision is provided deference based on the

19  state court's accurate application of Strickland, the argument is unpersuasive.

20                    c.      Third Sentence

21      The third sentence of the state court's decision held "[t]o grant the petition the Court

22  would have to accept, as factually correct, all of petitioner's allegations and disregard all the

23  facts proved in the trial." This statement too misstates the relevant inquiry regarding

24  ineffective assistance of counsel.

25      Under Strickland, a court must determine whether counsel's performance was

26  constitutionally deficient and whether there is "a reasonable probability that, but for

27  counsel's unprofessional errors, the result of the proceeding would have been different." Id.

28  at 694. The inquiry does not require disproving the facts and allegations levied against

Petitioner at trial. Instead it focuses on counsel's unprofessional errors and the effect of those errors on the outcome of the trial. Satisfying that burden does not require the state court to "accept, as factually correct, all of petitioner's allegations and disregard all the facts proved at trial." Moreover, it is unclear why the court would have to disregard all of the facts proven at Petitioner's trial to grant relief. His claims of ineffective assistance of counsel are based on counsel's failure to present witnesses in Petitioner's defense. The evidence that the defense witnesses could have provided would not cause the jury or any reviewing court to disregard the prosecution's case. Instead it would provide additional facts and issues which might alter the jury's determination of guilt or innocence. Moreover, the state court was required to accept, as factually correct, all of Petitioner's allegations in conducting the threshold determination of whether such allegations, if true, would entitle Petitioner to relief. People v. Duvall, 9 Cal. 4th 464, 474-475 (1995); Cal. R. Ct. 8.385(d)). It is difficult to determine the intent of the state court in drafting the third sentence of the decision. However, to the extent that the state court created additional requirements of Petitioner for entitlement to relief under Strickland, the statement is contrary to federal law.

d.     Conclusion

"Section 2254(d) requires [federal courts] to give state courts' opinions a respectful reading, and to listen carefully to their conclusions, but when the state court addresses a legal question, it is the law 'as determined by the Supreme Court of the United States' that prevails." Williams v. Taylor, 529 U.S. at 387. This court has made a thorough review of the state court decision and while affording it appropriate deference, has determined that no plausible interpretation of the decision can be made which would support a finding that the court accurately stated clearly established federal law, i.e., the Strickland ineffective assistance of counsel standard. Accordingly, the state court's decision is both contrary to and an unreasonable application of clearly established federal law. Taylor v. Maddox, 366 F.3d 992, 1001 (9th Cir. 2004) ("[W]here the state court's legal error infects the fact-finding process, the resulting factual determination will be unreasonable and no presumption of correctness can attach to it."); Sessoms v. Runnels, 691 F.3d 1054, 1058 (9th Cir. 2012)

("The state court decision is both contrary to and involves an unreasonable application of Supreme Court precedent because it... analyzed [petitioner]'s case using the incorrect legal framework.); Wade v. Terhune, 202 F.3d 1190, 1195 (9th Cir. 2000).

Based on the plain meaning of its decision, no fairminded jurist would find that the state court reasonably applied the clearly established Supreme Court law under Strickland. Since the last reasoned state court decision was contrary to or an unreasonable application of clearly established federal law, it is not entitled to deference and "AEDPA's restrictions do not apply." Sessoms, 691 F.3d at 1062 (9th Cir. 2012) (citing Panetti v. Quarterman, 551 U.S. 930 (2007) ("[R]eview of petitioner's underlying incompetency claim is unencumbered by the deference AEDPA normally requires."). "[w]here the analysis on federal habeas. . . results in the conclusion that § 2254(d)(1) is satisfied, then federal habeas courts must review the substantive constitutionality of the state custody de novo." Frantz v. Hazey, 533 F.3d 724, 736-37 (9th Cir. 2008) (en banc); Sessoms, 691 F.3d at 1062.

Since this Court shall conduct *de novo* review of Petitioner's claims, it is not subject to the evidentiary limitations set forth in Cullen v. Pinholster, 131 S. Ct. 1388 (2011). See Miles v. Ryan, 691 F.3d 1127, 1142 (9th Cir. 2012) ("[De novo] review is not subject to the evidentiary limitations announced in Pinholster, though it is subject to the limitations in § 2254(e)(2)."); Hurles v. Ryan, 2013 U.S. App. LEXIS 1305, *11-12 (9th Cir. Jan. 18, 2013).

### 5.   Law Applicable to Ineffective Assistance of Counsel Claims

"Errors that undermine confidence in the fundamental fairness of the state adjudication certainly justify the issuance of the federal writ." Williams v. Taylor, 529 U.S. 362, 375 (2000) (citing Teague v. Lane, 489 U.S. 288, 311-314 (1989) The Supreme Court has held that the deprivation of the right to the effective assistance of counsel is such an error. Id. (citing Strickland, 466 U.S. at 697-698.)

To establish ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient and that he was prejudiced by the deficiency. Strickland, 466 U.S. at 687-88. Deficient performance is established when "counsel's representation fell below an objective standard of reasonableness." Id. at 688. In determining deficiency, "a

court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689 (internal quotation marks omitted). Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Harrington v. Richter, 131 S. Ct. 770, 788 (2011). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. Id. (quoting Strickland, 466 U.S. at 690). Furthermore, "Strickland, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." Id. at 790 (quoting Strickland, 466 U.S. at 688); see also Cofske v. United States, 290 F.3d 437, 444 (1st Cir. 2002) ("The Strickland test. . . is an objective one; as long as counsel performed as a competent lawyer would, his or her detailed subjective reasoning is beside the point."). "Thus, 'the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" Cullen v. Pinholster, 131 S. Ct. 1388, 1403 (2011) (citing Strickland, 466 U.S. at 689.)

"A lawyer who fails adequately to investigate, and to introduce into evidence, information that demonstrates his client's factual innocence, or that raises sufficient doubts as to that question to undermine confidence in the verdict, renders deficient performance." Reynoso v. Giurbino, 462 F.3d 1099, 1112 (9th Cir. 2006) (quoting Lord v. Wood, 184 F.3d 1083, 1093 (9th Cir. 1999)). The Supreme Court has long "referred to [the American Bar Association ("ABA") Standards for Criminal Justice] as guides to determining what is reasonable." Rompilla v. Beard, 545 U.S. 374, 387 (2005).

In addition to establishing deficient performance, Petitioner must establish prejudice. To do so, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland,

466 U.S. at 694; <u>Wood v. Ryan</u>, 693 F.3d 1104, 1118 (9th Cir. 2012).

        6.   <u>Analysis</u>

            a.    Relevant Facts

In evaluating counsel's performance, his actions and the evidence he presented at the trial one are particularly illuminating. The evidence that counsel told the jury he would present in trial two and that which was available for him to present in trial two had in fact been presented at trial one. Thus, the record of the first trial removes speculation as to defenses which could have been mounted. Accordingly, the testimony of defense witnesses from trial one is described in some detail before discussing what actually occurred and did not occur at trial two.

           (1)   *Evidence Presented at First Trial*

            (a)    Fire Expert

As noted, at both trials the prosecution presented expert testimony that burn patterns, the heat of the fire, MPD shoe evidence, lack of fuel, and other physical evidence all pointed to Petitioner's guilt.

At Petitioner's first trial, defense counsel presented Dr. Donald J. Myronuk to refute the opinions of the prosecution's fire experts. (RT 3469.) Myronuk was a mechanical forensic engineer with a bachelor's and master's degree from Queen's University in Kingston, Ontario, Canada and a Ph.D. from the University of Illinois at Urbana-Champaign. (RT 3470-72.) From 1969 to 1992, Myronuk was a professor and, eventually, an associate dean of engineering at San Jose State University. (<u>Id.</u>) As a representative example of his work, Myronuk had participated in the analysis and reconstruction of the automobile collision in the Paris Tunnel that took the life of Princess Diana. (RT 3475.)

In response to the State's case, Myronuk testified at the first trial that the fire was caused by a natural gas leak from the kitchen stove. (RT 3480.) He explained that a brass flex hose connecting the stove to the wall was susceptible to corrosion by common kitchen chemicals including ammonia-based cleaners. He believed that such corrosion had led to a gas leak which found a point of ignition at either the pilot light on the range, on the oven,

or on the living room wall furnace. (RT 3587.) Similar fires had generated concern and had been the focus of a *CBS Eye on America* investigation and brass hoses eventually were replaced by stainless steel ones. (RT 3570.) Myronuk did not examine the stove as it had already been removed from the house and apparently placed, and obscured, in a large pile of debris on the driveway and not visible.[18] (RT 3774.)

Contrary to the opinion of the prosecutions's experts at trial two, Myronuk testified that after igniting in either the living room or the kitchen, the fire had traveled to the garage. (RT 3498-99.) He based this conclusion on the fact that the door to the garage was only partially burned on the garage side, but the door and metal door handle were completely destroyed on the kitchen side. (RT 3492-95.) Smoke patterns indicated seepage from the kitchen to the garage. (RT 3491-92.)

Myronuk also testified that the smoke patterns on the top portion of the door and the failure of its top hinge indicated that the fire was initially high burning, not low burning as claimed by prosecution experts. (RT 3491; 3496-97.) His opinion in this regard was consistent with the fact three firefighters had been able to crawl into the kitchen during search and recovery efforts. (RT 3496-97.)

Myronuk disputed the prosecution's expert's claim that there had been insufficient fuel load in the garage to have allowed the fire to spread without an accelerant. He testified that benches, cabinets, and a plywood partition wall in the garage would have provided significant fuel. (RT 3501-02.) He also concluded that damage and holes to the living room floor, directly below areas where the roof had collapsed, could have been caused by burning roof supports that fell during the fire, not an accelerant. (RT 3512-13.)

According to Myronuk, the patterns on the floor in the kitchen, living room, and garage were caused by falling tar from the composite shingles on the roof rather than from the pouring of a liquid accelerant. (RT 3484-85; 3513.) Experiments he conducted with roofing from the house confirmed this. (RT 3485.) He also noted that the floor patterns were

---

[18] Daniel Jones testified that there was another stove in the garage of the house at the time of the fire. (RT 4029.) Accordingly, it is unclear which (if either) stove was in the debris pile.

absent in the area where the kitchen door had fallen and shielded the floor from falling tar. (RT 3515-16.)

Myronuk disputed the State's theory that because the rental home was secure from outside entry, it must have been entered by someone with a key, someone reaching through a pet door in the rear of the garage, or by someone removing a rear sliding glass door from its track: a two-by-four secured the rear garage door and there were no pry marks on the track of the sliding glass door to indicate that it had been levered out of its track. (RT 3520.) The sliding glass door weighed 110 pounds and prying it open would have left large tool marks. (RT 3522-23.) Moreover, the door had melted in a closed position. (RT 3525-26.)

Prosecution witnesses described a 'whooshing' sound suggestive of an accelerant igniting. Myronuk opined that this sound came from the release valve on a back patio barbecue propane tank designed to release pressure when exposed to heat. (RT 3527-28.)

Myronuk believed that the presence of MPDs at the scene and on Petitioner's shoes was not indicative of Petitioner's presence at the scene or that MPD's were used to ignite the fire. The MPDs in the living room and on a pair of Petitioner's shoes could have come from a number of different sources. (RT 3552-54.) Myronuk theorized that the MPDs on the shoes were likely from shoe polish, laminate materials, or adhesives, while the MPDs in the living room were likely from melted polyurethane on the entertainment center or from audio and video components. (RT 3531.) He further testified that some shoes test positive for MPDs straight out of the box because of adhesives and other chemicals used in the assembly process. (RT 3552-53.)

During trial, police detectives testified that the engine of Petitioner's motor home was cold to the touch on the morning of the fire. (RT 7799-7800.) Myronuk described an experiment he conducted on a similar motor home to show that the engine would have retained detectible warmth had it been driven in the middle of the night in the manner described by Sandoval. (RT 3565-66.)

                        (b)      Eyewitness Reliability Expert

In response to Sandoval's identification of Petitioner several months after the fire,

trial counsel presented Dr. Elizabeth Loftus, a professor of psychology at the University of Washington, regarding the fallibility and suggestibility of eyewitness testimony. (See RT 3591-3573.) Loftus explained how factors such as the amount of light and the distance from an object or person can influence not only a witness's ability to see clearly, but also her ability to accurately acquire memory of an observation. (RT 3595-96.) She focused mainly on factors that affected the retention of memory and explained in detail how post-event information can supplement, distort, and contaminate a person's recollection. She described, as an example, a study where participants who saw a car pass through a yield sign and collide with another vehicle became convinced, as a result of later-presented suggestive information, that the sign had been a stop sign. (RT 3597-99.) Loftus also explained that photo line-ups in which a witness is repeatedly exposed to a potential suspect can be very suggestive. (RT 3602-03.) She testified that a witness's memory immediately after an event is the strongest and most accurate.[19] (RT 3613) Ultimately, she concluded that "all the ingredients were present" for a hypothetical witness like Sandoval to have been influenced by the post-event information presented in the case:

> A. Well, first of all, it's clear that post-event information is present in the environment of this witness. When she goes from making her initial description, which includes an age estimate of late thirties and early forties, which is in early police reports, and she then makes no identification after looking at the face of who you're calling Mr. X in the hypothetical, and then there is lots and lots of exposure in the community to the face of Mr. X, both in photographs in the newspaper, also on television, that it is a reasonable explanation for why he might look familiar at the time he is seen in the courtroom during the hearing six months later that the post-event information could have been absorbed and could have in this case supplemented or altered her recollection.
>
> And that influence of post-event information can also explain why she may be attempting to be very honest but she has these changes, significant changes in her estimate of age, for example, going from late thirties or early forties to now identifying who's in his fifties. Again, one of the major reasons why somebody's testimony changes is that they have, and assuming they're not lying, is that they've been exposed to post-event information, so you have all the ingredients here for being influenced in that way.

(RT 3611-12.)

---

[19] On the morning of the fire, the eyewitness Sandoval described someone much different than Petitioner and was unable to identify Petitioner in a photo lineup. (See generally, Limitations F&R.)

-42-

1    Loftus also elaborated on how Sandoval's viewing of Petitioner in a police line-up and

2    at the preliminary examination could influence her identification of him.

3        Q. Does the fact that as he is, as Mr. Souliotes in this particular situation
         is depicted in the photo lineup that was shown to her on January 16th,
4        does that fact influence her ability to identify him six months later at a
         preliminary examination when he is wearing precisely the same thing and
5        seated in the courtroom, you know, some 15 or 20 feet away?

6        A. It could, it could increase the familiarity for her. I mean, in fact, she has,
         by the time she makes her identification in that six-month-later hearing,
7        she's seen him before.

8        Q. Okay.

9        A. And she's either seen him in the photograph, and she's possibly seen
         him in the newspaper, possibly, I mean, it seems somewhat likely, but let's
10       just put it at possible. But she's definitely seen his photograph.

11       Q. Okay. And now, at her trial testimony, where she is again positive, that
         would include her identification at the preliminary examination as a factor
12       influencing it, and perhaps a photograph, and she may not even know why
         it is familiar to her. Is that fair?
13
         A. I think it's, you know, unless you have some other reason or some other
14       evidence for assuming that there's a deliberate fabrication going on, that this
         could be somebody who's trying to be honest and accurate but is potentially
15       influenced by post-event information that influences many of us.

16   (RT 3617-18.)

17       The district attorney cross-examined Loftus as to whether she interviewed the two

18   witnesses who identified Petitioner, Monica Sandoval and Hope Warner, and whether she

19   could determine if the witnesses' identifications were inaccurate. (RT 3630, 3633.) Loftus

20   freely admitted that she did not interview the witnesses and that she could not say whether

21   their identifications were accurate or inaccurate. (Id.) She was however confident of the

22   potential effects of post-even information:

23       Q. Okay. Then we'll just go away from the quote and we'll deal with the
         applications. Is it possible that you were wrong about how the mind works in
24       terms of post-event suggestiveness?

25       A. I don't have -- I have very, very few doubts about the power of post-event
         information to contaminate memory. I've done hundreds of experiments that
26       have been replicated by many, many investigators. I don't begin to believe I
         understand all of it, and I might not be right about every single detail, but I
27       have little doubt about the power of post-event information to affect
         someone's recollection.

28

-43-

(RT 3665-66.)

(c)     Financial Expert

As noted, the prosecution in both trials presented a financial expert to suggest Petitioner had a financial motive to start the fire.

During the first trial, Petitioner's counsel called a rebuttal financial expert, Shazad Contractor. Contractor was a certified public accountant with a Master's in Business Administration from Stanford University and who had worked as a financial auditor at Price Waterhouse. (RT 3349-51.) Contractor testified that Petitioner was not in any financial stress at the time of the fire. (RT 3354.) He noted that Petitioner paid his bills automatically from his bank account each month, an unusual practice for someone with financial difficulties because of fear there would not be enough money in the account to pay bills as they came due. (RT 3358.)

He also explained that someone with significant cash in the bank and relatively modest bills to pay could go many months before expending all cash reserves even if all sources of income were lost:

> And so my experience is that people who live close to the edge, who don't usually have a lot of reserves, don't have checking accounts that stay steady, don't have savings accounts that stay at $9,000. They're always trying to borrow money from card, credit card A to pay credit card B. They have cars that are not paid off. Their lease payments are due on the cars. Everything is hocked up to the ears. There was none of that in Mr. Souliotes's case.

(RT 3361-62.)

Based on Petitioner's financial history for the last five years up to and including December 1996, Contractor concluded that Petitioner was not in financial distress. (RT 3363.)

During cross-examination, Contractor explained that examination of any single month (e.g., a month in which Jones paid no rent) was not relevant to evaluating a person's overall financial situation:

> I really feel that the whole exercise is in error because what happens in January, '97, may not happen in February, '97, or March, '97, or April, '97. So when someone asks me how is this individual, what is his financial condition, I cannot put up one month of income and expense and based on

-44-

that one month come to my conclusions at all. So when you ask me did you check the rentals, it's of very little interest to me, because in January of '97 it may or may not be rented. So now if you look at the person's expense and income over five years and you say how did they manage their lives over five years, then I can come to some conclusion. Have I made myself more clear?

(RT 3380-81.)

To refute the prosecution's insinuation, based upon Petitioner's withdrawal of $8,600 in cash in Reno, that he might have a gambling problem, Contractor pointed to testimony from Petitioner's girlfriend and other evidence to show that the withdrawal apparently was used to purchase Petitioner's RV. (RT 3382-83.)

(d)     Forensic Psychologist

At the first trial, Petitioner presented an expert psychiatrist, Dr. Fred Rosenthal, to testify regarding victim Michelle Jones's psychiatric history. (RT 3384-87.) Based on his review of Jones's medical, psychiatric, and autopsy records, Rosenthal described her as a troubled individual with a long history of emotional problems starting in childhood. (RT 3390-94.) She had a difficult childhood: she had been diagnosed with cancer at an early age, had a below average IQ, was placed into foster care, ran away from home, lived on the streets for some time, and had a history of drug use. (RT 3394-95.) Rosenthal testified that children with this type of history usually become seriously depressed adults. (RT 3395.)

In 1994, Jones attempted suicide by cutting her wrists. (RT 3397.) She had sought psychiatric treatment several years before the fire, but had difficulty maintaining appointments. (RT 3398.) No drugs were found in her system at the time of death. However, during a period several years before the fire, she had been a fairly heavy occasional user of cocaine, amphetamines, marijuana, and nicotine. (RT 3399-3400.) Rosenthal thought her history reflected poor judgment and simplistic thinking. (RT 3401-02.)

(e)     Lay Witnesses

At the first trial, Petitioner presented several lay witnesses in addition to the above-mentioned expert witnesses.

Witnesses were called to show that Petitioner was not in financial distress and did not appear hostile to the Joneses during the eviction process. Thomas Bonte, Petitioner's

unlawful detainer attorney, testified that the judge found in Petitioner's favor, ordered the eviction of the Joneses and awarded Petitioner damages. (RT 3307-10.) He also noted that at the December 20, 1996 unlawful detainer haring, Petitioner agreed to stay the writ of execution until January 1, 1997, so the Jones family could remain in the house for the holidays. (RT 3311-12, 3319-20.) Bonte explained that Petitioner's demeanor during the eviction process was unremarkable when compared to other landlords the attorney had assisted in evicting tenants. (RT 3313.) Bonte thought that, in any event, Petitioner ultimately would collect the unpaid rent because Jones was regularly employed. (RT 3311.)

Gary Nelson, Petitioner's workers' compensation attorney, testified that Petitioner's workers' compensation case for injuries sustained while employed at Montgomery Ward was projected to produce an estimated lump sum payment of at least $100,000. (RT 3454-55; 3465-66.)

Petitioner's son, Demetrios Souliotes, testified that Petitioner offered to pay for his college. (RT 3688.) Petitioner's girlfriend, Jill LeBlanc, testified that Petitioner was tired of taking care of multiple rentals and was thinking about selling the Ronald Avenue property. (RT 3326-29.) She and Petitioner had been making plans for Petitioner to move into her home in Pleasanton, California, about 50 miles west of Modesto. LeBlanc was independently secure financially and not aware of any financial problems on Petitioner's part. (RT 3329, 3333-34.) They were planning a two month trip to Greece together, and Petitioner did not ask her to contribute financially. (RT 3336-3341.)

Trial counsel called witnesses to show that there were flaws in the criminal investigation and that the police failed to follow up on critical leads regarding other potential suspects. Detective David Trogdon of the Modesto Police Department testified that after the fire he canvassed the neighborhood asking if anyone had seen a class "C" type motor home; a type understood to be different than the motor home owned by Petitioner. (RT 3217, 27.) Modesto Police Detective Roger Lee testified that when interviewed on the day of the fire, Sandoval described the vehicle as a 'motor home' and never mentioned that it

was a Winnebago or had a "W" on the side.[20] (RT 3230, 3235-36.) Lee also described his interview of Bertha Love, a bank employee who, he said, explained that Petitioner demanded that the bank take the rental property back and threw his keys at her. (RT 3244-45.) Love testified that Petitioner did not throw his keys at her; Lee's notes make no mention of Petitioner throwing keys. (RT 2451, 3244-45.)

Demetrios Souliotes testified that Petitioner's English was poor and that his frustration communicating, inability to know the correct English word to use, use of his hands in speech and strong enunciation of words often caused others to think his father was upset when he was not. (RT 3689-90.)

Linda Flores, a witness otherwise uninvolved with the case, testified that before 7:00 a.m. on the morning of the fire she saw a beige or off-white, older Winnebago with "an olive green" or "brownish green stripe" and a "W" on the side drive around the parking lot of the unopened shopping center where she worked. (RT 3287-88.) The center opened to an alley which lead to the Souliotes rental property. (Id.) Flores testified that the driver suspiciously circled the parking lot and repeatedly looked down the alley towards Ronald Avenue. (RT 3287-88, 3291.) She was positive that the man driving the Winnebago was not Petitioner and that the Winnebago was different than Petitioner's. (RT 3289-90, 3301-02.) Flores reported the incident that day but was never contacted by police or other investigators. (RT 3290-91.)

LeBlanc testified that Petitioner was to drive the motor home to her house in the Bay Area on the day of the fire. (RT 3341-42.) The two were planning to spend several days traveling along the California coast in the motor home before attending a swing dancing convention in Monterey. (Id.) Such testimony could explain why Petitioner was seen moving the motor home the night before in preparation for the trip.

Petitioner presented several witnesses to challenge Hope Warner's credibility. Apolis Crain testified that he was at the mobile home park during the time that Warner described

---

[20] Sandoval's subsequent identification of the motor home was filled with inconsistences, but always focused on the fact that it was a Winnebago since it had a 'W' on the side.

the exchange between Petitioner and Michelle Jones. He did not witness any argument and was warned by Warner to testify consistently with her. (RT 3277-78.) In fact, LeBlanc, testified that on the day of the alleged altercation, she went with Petitioner to the Greek Consulate and a medical appointment in San Francisco. (RT 3336-3341.) Russell Downing, the owner of the mobile home park, and Warner's employer at the time, stated she filed a false flood damage claim with the Federal Emergency Management Agency. (RT 3181-85.) Additionally, Warner's daughter had sued Downing for injuries sustained in a fall in a fence-post hole on his property - even though the hole had been repaired three weeks before the fall. (Id.)

The defense also presented other witnesses to support the possible theory that Michelle Jones was unstable and may have either committed suicide or attempted to use the stove to heat the house. Linda Holway, Daniel Jones's teacher testified that Michelle Jones would sometimes be inappropriately dressed and that she was hyper and nervous.[21] (RT 3193-95.) Barbara Ann Bender, a friend of Michelle, who was at the house the night of the fire testified that the Joneses kept a couch against the fireplace in an attempt to keep cold drafts of air from entering the house. (RT 3202-04.)

(2)    *Promises Not Kept*

Trial counsel made several specific representations to the jury about testimony defense witnesses would provide at the second trial. He said that the evidence would show that the fire was not arson, but accidental.[22] (RT 5691-92.) He maintained that a critical review of the fire science presented at trial would show that Petitioner was factually innocent

---

[21] "Like it might be cold and, I don't know for what reason, but she would come in shorts and maybe barefoot and run up to the door to get Daniel." (RT 3193-95.)

[22] "We believe that by the end of this case, you will see that this was not a deliberately set fire to start with. Again, I reiterate from an overall picture, and I ask you to keep this in mind, a solution in search of a problem.

Now, that's not a glorious thing to say, that we've investigated a case, we've caught an arsonist and we've brought him to trial. It's almost inglorious to say that it may have been accidental and tragic, but that's what the facts will show." (RT 5691-92.)

-48-

and that the prosecution would fail to prove the case beyond a reasonable doubt.[23] (RT 5721.)

Trial counsel specifically described how he would present a fire expert, a forensic pathologist, and at least four lay witnesses. Counsel described the fire expert, Dr. Myronuk, and the evidence he would present to refute the prosecution's claims of arson.[24] (RT 5705.) Defense counsel went into significant detail regarding Myronuk's promised testimony.[25] (RT 5706-07.)

In addition to statements regarding the cause and origin of the fire, counsel represented during the opening statement that he would present evidence regarding the unstable mental history of the victim, Michelle Jones, including evidence of a prior suicide

---

[23] "There should be the precision that fire science 101 ought to be able to bring to bear on this case, and I'm going to ask you to be critical in that way of all of the facts that you see and make up your own minds. But I think, once the facts of these case -- of this case is known to you and that you merge it with your own common sense and the law as the Court gives you, you're going to find that George Souliotes is factually innocent of this. It's not just a matter of a reasonable doubt in the case, but that George did not have anything to do with this fire. Thank you." (RT 5721.)

[24] "But there is an expert that will talk to you from the defense, Donald Myronuk, who is a -- an engineer, an expert in fire science, the type of guy that trains firefighters, arson investigators, a guy who had recently come back from being asked to reconstruct Princess Diana's accident in the Paris tunnel; that he came back here and he will have an opinion for you as to how this fire started, what fueled it and where it started, and basically that opinion is is that this is a natural gas fire. This is not an arson at all." (RT 5705.)

[25] "Dr. Myronuk will tell you that that gas stove, once the arson investigators believed that this was an arson, was gathered up with all the rest of the junk in the house and thrown into a big pile out here in front in the driveway to be discarded, with bulldozers piling stuff onto a truck and driven away. So the stove itself does not survive, but the flex tube from the wall with a crack in it does survive and it will be given to you, shown to you here in evidence, as does a photograph that the arson investigators produced. By walking through the scene with a video, we were able to take the video and stop frame on that stove, the only picture that we have of the stove immediately after the fire, while it was still hot in the house.

The condition of the stove is is that the door is open on it, and Dr. Myronuk will tell you that the door on the stove was open at the time of the fire, before the fire; it was not opened as a result of the fire, and that there is evidence that there is fire being pushed out of the stove, across the face of the inside of the stove door. He will tell you that the greatest measure of charring or depth of charring, which indicates length of burn and how hot the burn is, occurs right in the ceiling over the stove itself in the house. It's very deeply charred. It's his opinion that at some point in time that stove was turned on by an occupant of the house who was securely locked in after Dan Jones had gone to work, mom and the two kids were in there; that that stove was turned on, possibly because of a very, very cold night, for added heat in the house." (RT 5706-07.)

-49-

attempt.[26] (RT 5719-20.)

Promises were also made during the opening statement that the defense would present several lay witnesses, including a friend of Michelle Jones, who would testify that Michelle "complained bitterly about the cold and that there was insufficient heat in the house."[27] (RT 5707.)

In response to the prosecution's presentation of Hope Warner, the manager of the trailer park who reportedly witnessed a verbal altercation between Petitioner and Michelle Jones, trial counsel promised to present her employer to challenge her credibility. (RT 5710.) ("We'll bring her boss in here to tell you what kind of person she was and what her duties were.") Counsel also stated that the jury would hear evidence from Daniel Jones's teacher that he was in school at the time of the altercation. (RT 5711.) Furthermore, counsel

---

[26] (See RT 5719-20.) At Petitioner's first trial, Dr. Fred Rosenthal was called to present testimony regarding Michelle Jones's psychiatric history. Counsel explained:

I want to be delicate about it, there were some indications from the autopsy of Michelle that were brought to the attention of doctors, seen by doctors, that suggested that there may have been a prior attempt at suicide as well. Now, again, I'm not going to say that a mother did this and that there were two children in there doing this. I'm not going to say that, but I'm going to tell you what one fact leads to another.

From the indication of a cut wrist, we gathered an entire medical history, back to childhood, for Michelle Jones and submitted it to a physician to review to perform what is known as a psychiatric autopsy. This is kind of a mental health history. And Michelle Jones had many, many years, back to her earliest days in foster care, drug addiction, difficulties with injecting cocaine, with marijuana, and she had suicide tendencies that dated way back. There had been a prior unsuccessful suicide attempt on her part.

You'll hear that she had many suicidal ideations, what they call ideations that were reported to doctors that she deliberately kept Mr. Jones in the dark about. From 1984 Kaiser Hospital coverage that she had had been terminated because the psychiatric unit there had felt that she was long-term and chronic in her disabilities and that they would not cover it. That was as early as 1984.

And that you'll learn ten years later, in 1994, that she reapplied to have reconsideration of that health benefit in order to cover some of the psychiatric difficulties that she was having then, and that at some point in time in the reevaluation in the process, in the most heartrending statements to the doctors in the reports that we found, "I can't let my husband know about this. He would leave me if he knew about the fact that I was injecting cocaine one or two times a week and that I smoke marijuana," etcetera, etcetera.

(Id.)

[27] This evidence was provided by defense witness Barbra Bender in the first trial. (RT 3202-10.)

explained that Petitioner was in San Francisco with his girlfriend Jill LeBlanc at the time of the alleged confrontation witnessed by Warner.[28]

Thomas Bonte, Petitioner's unlawful detainer attorney, was to describe how Petitioner allowed the Joneses to remain in the rental house over the holidays despite the failure to pay rent. (RT 5716.) Bonte was to explain that Petitioner's frustration with delays in the eviction proceeding were not out of the ordinary. (RT 5617.) Finally, counsel described how Earl Linham would testify that he had offered to purchase the rental house from Petitioner. (RT 5715.)

During the second trial, counsel did present Linham, albeit out of sequence, during the prosecution's case. (RT 7978.)

Otherwise, when it came time to present the defense case, counsel rested. He did not present any of the other witnesses he had promised would testify. (RT 8935-36.)[29]

(3)   *Defense Counsel's Closing*

On May 2, 2000, the prosecution rested its case. Rather than presenting a defense, trial counsel responded:

> We began yesterday, Your Honor, by having at least seven witnesses here and available to begin testifying with the expectation that our case would take about two weeks, and I think I mentioned that to the Court, but we have come to the conclusion that the People have not proven their case and based on that we are prepared to rest right now.

(RT 8935-36.)

Two defense witnesses, Russell Downing and Apolis Crain, appeared at court at the request of defense counsel to offer testimony, but were told that their testimony was not

---

[28] "He was at the doctor's at the University of San Francisco in San Francisco with his girlfriend, and shortly thereafter he was at the Greek Consulate, and all of those appointments and his presence in both locations at the time this supposedly takes place down there is documented and you'll hear evidence touching on that." (RT 5710.)

[29] It is noted that about a week before one of the prosecution's fire experts was to testify, trial counsel sent him a transcript of Myronuk's testimony from the first trial. (RT 8541.) Then, in the second trial, defense counsel questioned the fire expert about Myronuk's theories from the first trial. (Rien Decl. at 4.) Having presented Myronuk's theories through such questioning of prosecution's experts, defense counsel felt he had gained the benefit of Myronuk's expertise without having had to subject him to cross examination. The extent to which the prosecution's expert conceded or disregarded Myronuk's testimony is discussed below (See note 42, *infra*.)

required. (See Decls. of Russell H. Downing and Apolis Jacob Crain, Exs. J & K to Pet.)

Beyond the following, defense counsel did not explain to the jury why he did not call the promised witnesses:

> So the first thing that I need to tell you is that I gave you an opening statement and I told you a lot of things about what I expected the evidence would show in the case, and it boiled down to a couple of things. I probably mentioned some witnesses that we have not had come in, so anything that I've said about any of those witnesses in the opening statement should be disregarded, unless you heard something of it from the witness stand, and I think in a lot of cases you probably did, anyway, but it should otherwise be disregarded.

(RT 9061.)

### (4)    The Prosecution's Response

In the closing arguments, the prosecution relied upon the unrebutted testimony of the prosecution's fire experts to conclude that the fire was caused by an accelerant.

> Smell the smoke, the heat, the flames, as they rise up and fill this house at 1319 Ronald. Someone summoned that demon of fire, this fire that went in search of fuel, air, to the back of the house and took the lives of Michelle, Daniel Junior and Amanda. This living, breathing fire. It came to life that morning as a demon fire as it arose from the floor and it consumed everything in its path and it took those lives. We're here to decide who unleashed that demon that morning; who summoned up that demon to burn this house, to burn these three people, to cause their death. Michelle, laying in the bed. Gets up, is overcome by the heat and the smoke, falls to the floor.

> This fire was moving very, very fast. This fire was doing everything it can, everything it could to take over this house like that (indicating.) This fire was an unnatural fire. This fire was not something that had been seen by the likes of firefighter after firefighter after firefighter that came in here and testified that it was an unusual fire. That it was a fire that they had never seen before. It was a hot fire. It was unlike any other type of fire that they had seen except for accelerant fires.

> That demon was brought up from that pool of burning liquid. That demon was put on the floor of the living room, the floor of the kitchen and the floor of the garage. And it came to life and as Captain Evers and Captain Reuscher said, somebody put flame to that liquid and brought it to life.

> ....

> Battalion Chief Bryant in all of his years of experience had never seen a residential fire like this before. This was an unnatural fire. This was that demon that we are talking about.

> So as you think about this and you're asked the question that the Judge has given you yesterday, your instructions, on the elements of the

crime in this particular case, it comes down to really one thing. Was this an arson fire.

What is the evidence that was presented to you about that particular point? You had every firefighter who came in and said this is not something we had seen before. This was unusual. And you had two experienced experts, two arson experts, Captain Reuscher and Captain Evers, tell you this was an arson fire.

(RT 9013-15.) The prosecution, stressing the experience and ethics of the prosecution's fire experts, explained that the jury should rely upon their professional judgment that the fire was intentionally set:

And, you know, they did give you cause and origin to their satisfaction, maybe not to the defense's, but again, the law doesn't require us to meet the defense burden because they don't set the standard. The law does. Captain Reuscher, Captain Evers told us that this was a hand, put flame to fuel. It was not an accidental, natural, electrical or other occurrence. This was an intentional act where someone ignited a fuel that had been poured in the living room, the kitchen and the garage. That has never changed.

And that's something that these two men, in their expert opinion, their professional judgment, their years of experience, they are satisfied with. And you also heard from them the fact that they've examined other fires before and they will not, unless they are certain, say it's an arson. Even if they suspect that it's an arson, they will not come back with a report saying it's arson. Just like drawing the black lines and the red lines, unless they're certain, they're not going to call it an arson, and that is the integrity and the ethics of those two men.

(RT 9247.) Based on the opinions of the experienced firefighters that the fire was arson, the prosecution instructed the jurors to focus on the only issue it believed remained - the identity of the arsonist.[30] (RT 9048.)

Trial counsel spent little time in his closing argument before criticizing the defense for its failure to present the promised fire science expert and forensic psychologist:

You have the where is Waldo defense expert, Dr. Myronuk. We don't know what he looks like. We didn't see him. We didn't hear him. Something you were deprived of. You were told from the defense opening statement you were going to hear from him. You were going to hear from the expert who was going to say, well, maybe Michelle committed suicide. Those things were

---

[30] "Again, it comes back to was this an arson. Everything kind of flows from that point. So if you believe Captain Evers and you believe Captain Reuscher, the arson is proven. From that, the rest of it is proven, and the only thing that maybe is in issue is who did it. The elements of the crime are there and it's that easy to prove it." (RT 9048.)

deprived to you. So you were there were certain questions that were asked of Captain Evers about this Dr. Myronuk that you didn't get to see or hear.

(RT 9015.)

At closing defense counsel repeatedly attacked the defense's failure to call Myronuk by referring to him as the "Where's Waldo"[31] expert, and the "mythical Dr. Fire." (RT 9015-17, 19.) Based on the failure to present Myronuk, the prosecution discounted his opinion and told the jury that it could rely exclusively on the opinions of the experts presented by the prosecution.[32] (RT 9017.)

During trial, the judge provided the jury with instructions regarding how to assess the credibility of competing expert witnesses:

> In resolving any conflict that may exist in the testimony of expert witnesses, you should weigh the opinion of one expert against that of another. In doing this you should consider the relative qualifications and the believability of the expert witness as well as the reasons for each opinion and the facts and other matters upon which it is based.

(RT 8848.) The prosecution reminded the jury of the same during closing statements, and argued that the jury could disregard Myronuk's theories presented during the cross-examination of Evers:

> The reason I show you the tape, remind you of some of the instructions the Judge gave you a couple days ago about expert opinions. They're only as good as the facts upon which they are based. You're supposed to judge the believability of the expert witness -- how believable is Dr. Myronuk when you haven't seen him? Now, you heard that he testified. You heard that all that material was given to Captain Evers for him to read, but Dr. Myronuk did not come to court and did not subject himself to cross-examination, kind of like Captain Evers and Captain Reuscher. Is that very believable? Somebody that won't even come and answer questions. So under those instructions the

---

[31] Where's Waldo was a series of children's books containing large illustrations of crowds of people in which the reader would have to search for the protagonist, Waldo, dressed in his distinctive red and white striped sweater and cap among the other people in the scene. Martin Handford, Where's Waldo? (Little, Brown and Co., 1st ed. 1987).

[32] "So if we take that away and we take away the possibility of there is some expert who we don't know anything about who says, okay. It happens in the kitchen. We take that away. What are the facts that you have, the facts that you have left here? The expert opinion of two experienced firefighters." (RT 9017.)

"[T]he laws of physics apparently don't apply to Dr. Myronuk's theory." (RT 9018.)

-54-

1    Judge gave you, guess what. You can throw out everything that he says.

2    ...

3    My job is to bring the witnesses to you for you to evaluate what the
     evidence is, for you to look at them, to compare your own life experiences to
4    those people when they testified. The defense didn't even have the courage
     to do that.

5
     They stand up and say, well, we don't have to prove anything, it's
6    the People's job. But we want you to believe Dr. Myronuk, but we don't
     have a duty to do anything. Well, where is this guy?

7
     The Judge has already given you the instructions on the believability
8    of an expert opinion. It has to be based, when you have got conflicts,
     based on the reasons for that opinion. Do we [know] one single reason for
9    Dr. Myronuk's opinion on anything? And the answer is no. Do we know the
     facts that that is based upon? And the answer is no. Those are the facts
10   that we have here.

11   (RT 9020; 9212-13.)[33]

12   So when you go back and you think about this evidence, think about
     who actually did testify. Think about who the witnesses were. Think about the
13   evidence that you actually got to evaluate and determine whether it's credible
     or not. Because it makes a difference. Just like it does with Dr. Myronuk.

14
     Dr. Myronuk didn't testify, so you're left with the situation by the
15   defense, that well, if it was agreed to by Captain Evers then it's a reasonable
     possibility. Well, what evidence do you have from him? What facts? None.
16   What's the basis for his opinion? None.

17   (RT 9223-24.)

18   The prosecution argued that the parties should rely more on the practical and real

19   life experience of the firefighters than academic scientific theories:

20   There was something else that was kind of unique, those medium
     petroleum distillates. We heard a lot about anything and everything could be
21   a medium petroleum distillate. But again we have the theoretical possibilities,
     this academic kind of world and we have real life. Those firefighters go out to
22   scenes all the time. They can tell the difference. The arson investigators told
     you that they had seen a number of fires that they examined and they didn't
23   say they were all arson. They don't just go, okay, heads is an arson. They go
     through and they pour through these burned down houses. You saw what the

24

25   [33] (See also RT 9023) ("So if there's this heat, this splaying behind the gas stove that produces
     this fire, why isn't that damage back there? Again, we can't ask Dr. Myronuk, so let's talk about what
26   evidence we do have in this particular case."); (RT 9039) ("So this fire is happening like that from the
     witnesses, not from a theory of Dr. Myronuk.... And again here's where the laws of physics don't seem to
27   apply to Dr. Myronuk. Possibilities, academia, that kind of stuff.")

28

scene looked like in the videotape. And they go piece by piece to try to determine what the cause of the fire was. And in their experience these medium petroleum distillates were unusual, very unusual.

(RT 9033.)

I want you to think about one thing when you think about examining the credibility of Captain Reuscher and Captain Evers. You wake up, you smell smoke in your house. There's a fire. You dial 911. Who does it go to? It doesn't go to Dr. Myronuk. It goes to the fire department. It doesn't go to an academic institution that's going to run a test on whether you're actually having a fire.

(RT 9225.)[34]

The prosecution reminded the jury how the defense did call one witness and could have called more, but decided not to. (RT 9228-29.) ("They had the ability. They called one witness. They brought a witness in to say, well, I had a deal with George. ... So they could call witnesses, we know that. They did.") The prosecution concluded its closing statement by telling the jury to rely on the opinions of Reuscher and Evers to find that the fire was intentionally set by Petitioner:

I've proven that it was an arson. Two men that have done this for their entire careers, two retired captains from the fire department say it's an arson; and from that, the physical evidence, their expert opinion, all the other testimony of the firefighters proves that up, that this was an arson.

From that flows the rest. From that the finger of guilt points to the defendant. Doesn't point to the one-armed man. It points to George Souliotes because he's the one. The shoes tell the tale. He summoned that demon that morning. He poured that liquid on the ground and he brought that demon to life and that demon took Michelle, Daniel and Amanda. He is responsible, he is guilty, and justice accordingly demands that he be found that way. Thank you.

(RT 9050.)

(5)   *Defense Counsel Declarations*

During the state appeal process, Petitioner's Defense Counsel, Timothy Rien and Harry Traback, provided declarations explaining why they did not call previously presented and available witnesses at the second trial. (See Answer, Ex. D, Decls. of Rien and

---

[34] (See also RT 9035.) ("You have to look at the facts, not this theoretical kind of academic world.")

-56-

Traback, ECF No. 166.) Rien explained that:

> [W]e had embarked on an all-or-nothing strategy dictated by Mr. SOULIOTES' absolute insistence that he was innocent. This position never wavered throughout my two year association with and representation of him; a position he had maintained with his family and friends and to police investigators. Consequently, there was no middle ground to argue anything but absolute innocence to the jury.

 (Rien Decl. at 3.)

Rien explained that all former defense witnesses were contacted and indicated that they were available to testify. (Rien Decl. at 2.) With regard to Myronuk, Rien concluded that "[A] post verdict investigation, conducted by the defense, revealed that a substantial number of the jurors were disinclined to believe the defense arson expert, Dr. DONALD MYRONUK – not because his application of scientific principles to the case was wanting – but because his demeanor while testifying distracted from the substance of his testimony." (Id.) Traback, who was not representing Petitioner at the first trial opined that Myronuk's "expertise was spread fairly thin" during the first trial, that he "had an unquestionable academic grasp of the subject matter of his testimony, but a demonstrable inability to communicate that expertise in an effective way for the average juror," and that by deciding not to call Myronuk, the prosecution would no longer call Dr. DeHaan, "[o]ne of the prosecution's most effective rebuttal witnesses at the first trial." (Traback Decl. at 2.)

Based on the cross-examination of Sandoval and Reuscher, and "the introduction of virtually all relevant testimony of Dr. Myronuk" during the cross examination of Evers, counsel avoided subjecting Myronuk to cross-examination, and "concluded that we had established all necessary material to the argument, and had raised significant doubt as to the prosecution case in all other respects." (Rien Decl. at 4.)

Counsel met with Petitioner to discuss the new strategy of not presenting witnesses in Petitioner's defense. Counsel asserts that the strategy was "whole-heartedly endorsed" by Petitioner and his family. (Id. at 5.) Rien explained:

> While I was acutely aware of the influence that a trial lawyer might have over a client and members of the family in making such a bold

suggestion as to forego the presentation of defense witnesses, I was convinced by my own assessment that it was a reasonable call, and I was further encouraged by the view of Mr. TRABACK, Mr. SOULIOTES, and the members of the family who had been observing the trial the way the jury had.

(Id.)[35] Accordingly, no defense witnesses (other than Linham) were presented.[36]

At Petitioner's first trial, eleven of the jurors favored a verdict of guilt and one favored a verdict of not guilty. (Rien Decl. at 2.) Rien explained that the "centerpiece" of the prosecution's case was that an intentionally set fire caused the death of Michelle, Amanda, and Daniel Jones, Jr. (Id.) On the other hand, Rien explained that the defense theory was that the fire resulted from a defective gas stove in the kitchen. (Id.)

     b.  Analysis of Ineffective Assistance of Counsel Claim

      (1)  *Failure to Present an Arson Expert*

        *(a)*  Attorney Discretion Protected

Petitioner claims that trial counsel's decision not to present an arson expert was objectively unreasonable.

With regard to such a claim, the Supreme Court has explained that trial counsel is "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." Harrington v. Richter, 131 S. Ct. at 789; see also Alcala v. Woodford, 334 F.3d 862, 870 (9th Cir. 2003) (Explaining that the reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and petitioner must "overcome the

---

[35] While not necessarily admissible as evidence, appellate counsel met with trial counsel to discuss concerns with regard to the representation of Petitioner at trial. According to appellate counsel, Rien and Traback admitted that they made promises to present witnesses during the opening statement, that they should not have made such promises and the prosecution criticized trial counsel's failure to present witnesses. (Decl. Of Nicole Herron, Ex. S, Pet., ECF No. 1.) Trial counsel further explained that while Myronuk was too much of a cheerleader, his accidental fire theory was strong, and that besides suggesting it was too late to do so, did not provide any reason for finding an expert with a more acceptable demeanor. (Id.) Beyond explaining that the prosecution did not meet its burden, trial counsel did not provide specific reasons why they did not present other expert witnesses. (Id.)

[36] Petitioner asserted that he "was very concerned about my attorneys' decision not to present witnesses at the second trial, but I was inexperienced with the law and assumed they knew best." (Souliotes Decl. at 1, Pet., Ex. T.)

presumption that, under the circumstances, the challenged action "might be considered sound trial strategy.") (citations and internal formatting omitted). "[F]ew decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial." <u>Alcala</u>, 334 F.3d at 871 (citing <u>Lord v. Wood</u>, 184 F.3d 1083, 1095 (9th Cir. 1999)). This is especially so here where Petitioner's trial counsel appear to have been experienced and well-qualified criminal defense attorneys, and one of them, having tried the case to a hung jury, was in the best possible position to decide upon a strategy for the second trial.

Counsel need not always call an expert to rebut expert testimony presented by the prosecution. <u>Richter</u>, 131 S. Ct. at 791 ("But <u>Strickland</u> does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense."). Many times, cross-examination of the expert witness is sufficient and sound trial strategy can be to argue that reasonable doubt exists. <u>Id.</u> "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." <u>Id.</u> In <u>Harrington v. Richter</u>, the Supreme Court did not fault trial counsel for not preparing for forensic testimony that the prosecution had not expected or prepared to present at the start of trial. <u>Id.</u>

(b)     Expert Testimony at Core of Case

In the present case, however, it cannot be said that defense counsel was surprised by the prosecution's tactics. Timothy Rien was Petitioner's counsel at the first trial. The court re-appointed Rien to represent Petitioner at his second trial. (RT 4319.) Accordingly, Rien was aware of the evidence and witnesses the prosecution had presented at trial one and charged with responsibility to be prepared to meet that same evidence in trial two. As it turned out, the prosecution presented virtually the same case through the same witnesses the second time around. There was no element of surprise for the defense to overcome.

More specifically, defense counsel here had to know with near certainty that he would have to meet, at the threshold, evidence from prosecution experts that the fire was

intentionally set, i.e., that arson had occurred. Granted, the prosecution also offered, in addition to the fire science evidence, motive evidence (financial distress and ill-will to the Jones family) and Sandoval's testimony that she observed Petitioner drive to and walk towards the rental house. However, given Sandoval's credibility problems and the weak motive evidence, Petitioner's case hinged largely on undermining the expert witness testimony.[37] This Court previously found that "the fire science evidence presented at trial, including the MPD evidence placing Petitioner at the scene, was extremely strong evidence implicating Petitioner's guilt because reasonable and conscientious jurors may well have found Petitioner guilty in light of that evidence alone." (Order Adopting F&R, ECF No. 150 at 6.) Defense counsel even acknowledged as much during his closing argument:

> Arson must legally and factually be the first thing that's attacked because, again, unless you have an arson, who cares who's driving around at that time of the night? Who cares who's maybe putting garbage or running in behind the house or who cares about that? It doesn't mean anything if you are not convinced beyond a reasonable doubt that an arson took place.
>
> Even if there's a question in your mind about whether somebody broke into the house, if you have a question about whether it's a mistake, a misfortune, an accident, or you're uncertain about it, it can't be a burglary because proof of every element of a crime has got to be done beyond a reasonable doubt, and one of the elements of a burglary is the intent to commit an arson when you enter.
>
> So if you're uncertain about arson itself, burglary's not in the analysis either, so the prosecutor's case is kind of built on Captain Reuscher and Captain Evers, if you think about it at the outset, the whole arson case; and everything that's done after that, whether we're talking about the eviction, which goes to issues of identification; or anger, which goes to issues of identification; or financial condition, which goes to issues of identification, are all irrelevant unless there is proof beyond a reasonable doubt that there's an arson.

(RT 9055-56; see also RT 9150.)

In this case counsel knew of the existence of, and the likely testimony from, the

---

[37] Sandoval's testimony and the motive evidence presented against Petitioner is discussed below with regard to trial counsel's failure to present witnesses to rebut the same. Additionally, a thorough discussion of all of the evidence presented at trial is found in the Court's Findings and Recommendation addressing whether Petitioner made a sufficient showing of innocence under Schlup v. Delo. (See Limitations F&R and Order Adopting F&R, ECF Nos. 141, 150.)

prosecution experts and was bound to prepare for it.

(c)     Prosecution Experts Susceptible to Impeachment

Recognizing the importance of the prosecution's fire experts, a reasonable attorney also would have to consider the likelihood that he could successfully impeach them or suggest viable alternatives to their opinions. Here, the testimony presented at the first trial by Fire Captains Reuscher and Evers and by the defense expert, Myronuk, revealed a relatively hasty and incomplete investigation by the former two and alternative origin of fire theories presented by Myronuk.

Specifically, aside from points of scientific contention, Myronuk was capable of highlighting several inconsistences in Reuscher's theory that the fire was intentionally set. First, in his initial investigatory report, Reuscher opined that the arsonist entered the house though the door in the rear of the garage, poured an accellerant in the living room, the kitchen and, finally, the garage, and, leaving the door between the kitchen and garage open, lit the fire and left through the back garage door. (Ex. J-XII at 9.) Nevertheless, he concluded in his report that no point of origin of the fire could be located. (Id.) At the preliminary examination, he reiterated the same entry theory but added that burn patterns in the garage indicated that the fire started in the garage and went through the door into the kitchen. (CT 243-44.) In contrast, Evers testified at the preliminary hearing that the rear door to the garage was closed and braced by a two-by-four which prevented entry. (CT 314-16.)

When he testified at the first trial, Reuscher acknowledged that it was unlikely that an arsonist had entered the rear door of the garage, and instead claimed that the arsonist entered through the sliding glass door to the living room or a door to a rear bedroom. (RT 2136-2137.) He opined that the sliding glass door could have been opened by lifting it out of its track with a screwdriver. (RT 2138.) Also, he acknowledged for the first time that a partition wall separated the garage from the rest of the house. (RT 2081.)

Reuscher also relied heavily on positive indications from the use of his hand held hydrocarbon detector to determine that the fire was intentionally set and that Petitioner was

the arsonist. In his report, he stated that the "most compelling" evidence that Petitioner set the fire was that Petitioner and his clothing elicited positive responses from the hydrocarbon detector. (Resucher Rpt., Ex. J-XII at 10.) During the first trial, Reuscher testified that he used the detector to locate rough outlines of where accelerants had been poured. (RT 2125-26.) ("It seems pointless to me that the device is used simply to assist you in taking samples.") In contrast, Evers testified that the hydrocarbon detector could provide a positive reading even if an accellerant was not present and that it is "just a tool you've got to use in conjunction with your other visual observing." (CT 335.) Myronuk explained at trial one that the hydrocarbon detector was noting more than a "simple presumptive tool." (RT 3536.) Reuscher's reliance on its results was questionable.

Reuscher wrote his report prior to completion of laboratory analysis of chemical samples. (RT 2125-26.) Even though some of the samples from the fire and Petitioner's shoes tested positive for MPDs, Reuscher's report relied solely on the positive indications from the hydrocarbon detector to physically link Petitioner to the fire. (Id.) Ultimately, laboratory results did not confirm the presence of accelerants on many of the samples.

In short, Reuscher's opinions as to the point of entry of the arsonist and point of origin of the fire evolved over time and were inconsistent internally and with the opinions of Evers and Myronuk. The prosecution's experts failed to closely examine evidence at the scene and communicate with each other regarding their respective observations. Such deficiencies did not involve complex science, but simply reflected failures to properly investigate and document the fire scene regarding whether doors were locked or accessible and whether structures in the garage existed and potentially impeded the described ingress and egress of the arsonist and the fire. Additionally, Reuscher inappropriately relied upon the results of the hydrocarbon detector, even though his partner did not, and he did not wait for or use laboratory results to confirm or refute his conclusions.

Evers' opinion regarding how the fire started was also susceptible to attack. He concluded that an arsonist entered through the sliding glass door in the living room, poured

accelerant throughout the living room, kitchen and garage, and lit the fire either from the sliding glass door or through a pet door on the rear door to the garage. (RT 3008-09.) He ultimately concluded the fire was lit in the garage, but could not specify evidence relied upon to support that conclusion.[38] (Id.)

In summary, the prosecution's experts were vulnerable. If confidence in their conclusions could be challenged, alternative theories from Myronuk could become more persuasive. The fact that the jury in trial one had portions of Myronuk's testimony read back during deliberation is evidence that testimony was significant to the jury.

(d)    The Importance of Experts

In weighing whether to call an expert, the unique and potentially powerful impact of expert testimony must be considered.

"The rules give expert witnesses greater latitude than is afforded other witnesses to testify based on data not otherwise admissible before the jury." United States v. Hines, 55 F. Supp. 2d 62, 64 (D. Mass. 1999). More importantly, "a certain patina attaches to an expert's testimony unlike any other witness; this is 'science,' a professional's judgment, the jury may think, and give more credence to the testimony than it may deserve." Id.; United States v. Hebshie, 754 F. Supp. 2d 89, 113 (D. Mass. 2010) (same); see also Michigan Millers Mut. Ins. Corp. v. Benfield, 140 F.3d 915, 920 (11th Cir. 1998) ("The use of 'science' to explain how something occurred has the potential to carry great weight with a jury."); United States v. Blade, 811 F.2d 461, 465 (8th Cir. 1987) (noting that expert testimony enjoys an "aura of special reliability"); Werth v. Hill-Rom, Inc., 856 F. Supp. 2d 1051, 1067 (D. Minn. 2012) (same).

In this case, the forensic evidence presented by the prosecution was damning.

---

[38] Q. Was there some evidence that you observed that leads you to that conclusion?

A. No. Just trying to put the scene together. There's no -- when we got there, there's total destruction, but that would have been the safest place. There was two, two areas that it could have been, in my opinion it could have been ignited, but the safest area with the -- would have been the dog door in the man door to the garage. (RT 3009.)

-63-

Experienced fire captains testified with conviction that the fire was intentionally set. Reuscher's report concluded as such. (Ex. J-XII.) ("The findings of our fire investigation, the physical evidence, point clearly to a fire whose cause can be explained in no other way than a deliberate, intentional act of arson.") At the first trial Reusher concluded in his "opinion that this was a crude arson job and it's as obvious as an elephant the patterns on the floor, the patterns in the overhead of this structure correlate with each other. Liquids were poured throughout this house and ignited." (RT 2053.)

The prosecution emphasized the vast experience the fire captains had fighting and investigating fires.[39] (RT 4250.) Given the level of practical experience of Reuscher and Evers, two individuals who had dedicated their professional careers to public service, and the strength of their convictions that the fire was intentionally set, reasonably effective counsel would anticipate their testimony having a very strong impact on the jury. Unless effectively challenged, jurors could be expected to attach great significance to the opinions of such experienced firefighters. Trial counsel also should anticipate the skepticism which might be expected to greet his argument that the two fire captains did not fully appreciate scientific principles at hand or follow appropriate investigative protocols.

This Court previously determined that without evidence that the fire was intentionally set and that chemicals on Petitioner's shoes matched those at the fire scene, no reasonable juror would have convicted Petitioner based on Sandoval's eyewitness testimony and the other circumstantial and motive evidence alone. (Limitations F&R at 91-92.) The fact that the jury at trial one hung and the second jury convicted Petitioner "suggests great weight was given to the unrebutted fire science evidence in the second trial." (Id. at 91 n. 61.)

///

---

[39] (RT 4250.) (In closing, the prosecution stated, "And the two arson investigators, two men that have extreme amounts of practical experience investigating fires. Captain Reuscher who first testified as an expert I believe it was back in 1987. Captain Evers who's looked at 500 house fires, investigations. Those two men came and told you that this was an arson, period. This was an arson because a liquid accelerant was poured on the floor and that's what started this fire. No ifs, ands or butts.")

1

2

           (e)    Cross-Examination and Argument as Alternatives
                    to Expert Testimony

3

4

        In this case, defense counsel determined that his cross-examination of prosecution

experts, generally and regarding Myronuk's previous testimony, accomplished defense

purposes without having to subject Myronuk, considered a marginally effective

communicator, to cross-examination and exposure to state rebuttal experts.

5

6

        In certain cases, effective cross-examination of an expert witness may suffice. See

7

Richter, 131 S. Ct. at 791. The issue is whether this reasonably could have been perceived

8

to be such a case. Here, there was no doubt that the prosecution was going to present

9

expert fire testimony, that such testimony was extremely critical and the most damaging

10

evidence against Petitioner, and that such testimony had to be challenged over a broad

11

range of science, fire dynamics, and chemistry principals. A reasonable person also would

12

anticipate that the average juror would be uninformed about such matters and thus

13

substantially defer to explanations from experts.

14

        Nevertheless, as noted, defense attorneys are not always required to enlist expert

15

testimony to rebut expert testimony; it depends on the specific circumstances of the case.

16

Richter, 131 S. Ct. at 791; see also Showers v. Beard, 635 F.3d 625, 633 (3d Cir. 2011).

17

"The 1989 American Bar Association Guideline for Appointment and Performance of

18

Counsel in Death Penalty Cases, which is informative, albeit not dispositive, calls for

19

retention of expert witnesses when necessary or appropriate for preparation of the defense,

20

adequate understanding of the prosecution's case and rebuttal of any portion of the

21

prosecution's case at the guilt/innocence phase." Showers, 635 F.3d at 633 (quoting §

22

11.4.1(D)(7) of the ABA guidelines.)

23

        However, several circuit courts, including the Ninth Circuit, have specifically held in

24

given cases that counsel was ineffective for failing to present expert witnesses when

25

required to attack forensic evidence. "[W]hen the prosecutor's expert witness testifies about

26

pivotal evidence or directly contradicts the defense theory, defense counsel's failure to

27

28

present expert testimony on that matter may constitute deficient performance." <u>Duncan v. Ornoski</u>, 528 F.3d 1222, 1235 (9th Cir. 2008); <u>see also</u> <u>Harris v. Reed</u>, 894 F.2d 871, 878-879 (7th Cir. 1990) ("Under the circumstances, we conclude that counsel's overall performance, including his decision not to put on any witnesses in support of a viable theory of defense, falls outside the wide range of professionally competent assistance."). In <u>Harris</u>, trial counsel failed to present a theory regarding an alternate suspect. The court found that "a decision made without interviewing the witnesses, after preparing the jury for the evidence through the opening, and without consultation with [defendant] -- was unreasonable professional conduct." <u>Id.</u> In <u>Elmore v. Ozmint</u>, the Fourth Circuit found that "forensic evidence was always and obviously vital to the State's case." 661 F.3d 783, 863 (4th Cir. 2011). Accordingly, "the circumstances necessitated that the defense work to engender doubt about the forensic evidence." <u>Id.</u>

The First and Sixth Circuits have addressed issues of effective advocacy when faced with incriminating fire cause and origin testimony in arson cases. The First Circuit, in <u>Dugas v. Coplan</u>, found that counsel was ineffective in defending his client of arson of a grocery store. 428 F.3d 317 (1st Cir. 2005). The investigators determined the cause and origin of the fire to be a pile of papers in front of a shelf in the basement, ruled out accidental causes, and tested samples of the area of the burn, some of which contained MPDs. <u>Id.</u> at 320-21. "Like most attorneys," petitioner's counsel, an experienced criminal defense attorney "had no training in fire investigation; his scientific background consist[ed] of 'high school chemistry and physics.'" <u>Id.</u> at 321 ("I wouldn't know a hydrocarbon if I fell over one."). After some research, counsel decided not to pursue a defense that the fire was accidental and instead to focus on a defense that someone else started the fire. <u>Id.</u> at 323.

At trial, the "state's strongest evidence was its expert testimony on arson; the balance of its evidence was relatively weak." <u>Id.</u> at 323. Counsel did not present an alternative theory for the origin of the fire, but put forth a defense that another perpetrator started it. <u>Id.</u> at 323-25. Petitioner was found guilty. <u>Id.</u> On collateral review, the district court found that

counsel's performance was deficient. Id. at 326.

The First Circuit concluded:

> We also recognize that reasonably diligent counsel are not always
> required to consult an expert as part of pretrial investigation in a case
> involving the use of expert witnesses by the state. A defendant's lawyer does
> not have a duty in every case to consult experts even if the government is
> proposing to put on expert witnesses. There may be no reason to question
> the validity of the government's proposed evidence or the evidence may be
> so weak that it can be demolished on cross-examination.

Dugas v. Coplan, 428 F.3d at 328-29 (citing Miller v. Anderson, 255 F.3d 455, 459 (7th Cir.
2001).

However, the Dugas court found counsel's decision not to pursue a 'not arson'
defense constitutionally deficient on multiple grounds: it resulted from a failure to thoroughly
investigate; the arson evidence was the "cornerstone of the state's case"; there was little
evidence beyond it; counsel knew that a layperson would view the fire scene as arson and
that he would need expert assistance to convince a jury otherwise; and counsel had reason
to believe that there were flaws in the state's cause and origin determinations. Id. at 329.
Based on the above, the First Circuit found an "inescapable need for expert consultation
in this case." Id. at 331.

Further, the court found that counsel's actions could not qualify as reasonable
strategy as "[a] tactical decision to pursue one defense does not excuse failure to present
another defense that would bolster rather than detract from the primary defense." Id.
(internal citations omitted.) Counsel could have pursued both a "not arson" and "other
perpetrator defense." Id. Accordingly, the court held that counsel's "failure to thoroughly
investigate the 'not arson' defense and seek expert assistance [could not] be classified as
a conscious, reasonably informed tactical decision." Id. at 332.

The Sixth Circuit, in Richey v. Bradshaw, also found that failure to properly attack
arson evidence constituted ineffective assistance of counsel. 498 F.3d 344, 362-364 (6th
Cir. 2007). In Richey, counsel did not hire an expert until near trial, preventing him from
hiring another expert, and the expert, without performing independent testing, agreed with

the conclusions of the state expert. Id. at 362. Counsel did not inquire as to what the state expert had done to form his opinion or acquaint himself with the basics of the science involved. Id. ("A lawyer cannot be deemed effective where he hires an expert consultant and then either willfully or negligently keeps himself in the dark about what that expert is doing, and what the basis for the expert's opinion is."). The Sixth Circuit held counsel's strategy defective with regard to failing to adequately challenge the prosecution's fire science. Id. at 363 ("As we stated in our prior opinion, we can discern no strategic reason why counsel would have so readily ceded this terrain to the prosecution."). In a prior opinion in the same matter, the Sixth Circuit found:

> Finally, counsel failed to offer any competing scientific evidence. Of course, it is not always the case that counsel must continue looking for experts just because the one he has consulted gave an unfavorable opinion. However, the testimony of Custer and Armstrong makes it clear that, even in 1986, a reasonably diligent attorney would have found witnesses to attack the State's conclusions. And where there is substantial contradiction in a given area of expertise, it may be vital in affording effective representation to a defendant in a criminal case for counsel to elicit expert testimony rebutting the state's expert testimony. Nor was this a case in which counsel would have had to uncover an expert willing to spew junk science, because Armstrong and Custer both agreed that the scientific standards prevailing in 1986 would have seriously undermined the State's results, and both testified that they would have been available to apply such standards.
>
> Instead, counsel adopted a defense that rendered [Petitioner] a sitting duck.

See Richey v. Mitchell, 395 F.3d 660, 685 (6th Cir. 2005) (citations omitted) (vacated on other grounds by Bradshaw v. Richey, 546 U.S. 74 (2005)). Further, "where counsel knew that there were gaps in the State's proof having to do with the lack of accelerants on [Petitioner]'s boots and clothing, and the greenhouse owner's inability to say that any accelerants were missing, investigating the scientific basis for the State's arson conclusion became all the more imperative." Id. at 363. The Court finds counsel's failure in this case to present an expert witness to rebut the prosecution's expert testimony alleging arson akin to that in Dugas and Richey.

(f)     Why Not Call an Expert?

As noted above, the singular importance of the state's fire science evidence, the certainty it would be presented, its known vulnerabilities, and the crucial need to attack it convincingly were well known to defense counsel. The issue here is whether it was ineffective assistance of counsel to attack it solely by way of cross-examination and argument and without calling a rebuttal expert.

Declarations from defense counsel suggest at least three reasons for not calling Myronuk to testify at trial two:

1.  Despite his expertise, Myronuk was perceived as having a negative demeanor;[40]

2.  Myronuk's expertise was spread too thin;[41] and,

3.  By cross-examining Evers on Myronuk's testimony from trial one, Myronuk's opinions were put before the jury and defense counsel was permitted to argue them without having to subject Myronuk to cross-examination or impeachment by rebuttal experts.[42]

---

[40] Trial counsel explained in declarations that Myronuk was not presented at the second trial because his demeanor was off-putting. (Rien Decl. at 2.) ("[A] substantial number of the jurors were disinclined to believe the defense arson expert, [Myronuk] – not because his application of scientific principles to the case was wanting – but because his demeanor while testifying distracted from the substance of his testimony."); (Traback Decl. at 2.) ([Myronuk] had an unquestionable academic grasp of the subject matter of his testimony, but a demonstrable inability to communicate that expertise in an effective way for the average juror.")

[41] "Dr. Myronuk's expertise was spread fairly thin during the course of the first trial in that he testified not only as to the cause and origin of the fire," but to other key issues in the case as well. (Answer at 94.)

[42] Defense counsel asserts that the cross-examination introduced all the needed testimony of Myronuk and that "Evers conceded the accuracy of much Dr. Myronuk's work and findings." (Rien Decl. at 4.) That claim is not supported by the record. Usually when asked about Myronuk's opinions, Evers' response merely acknowledged that the statements attributed to Myronuk accurately reflected Myronuk's testimony. He did not endorse it. (See e.g., RT 8651 8681; 8697; 8720.) Furthermore, when directly asked, Evers flatly denied that Myronuk's testimony caused him to change his opinion that the fire was intentionally set:

Q. And now that you've had the opportunity to examine all of the facts upon which you agree with Dr. Myronuk, all of the facts that you disagree with Dr. Myronuk, and all of the facts that you may not be aware of that Dr. Myronuk may have testified to, does his opinion in any way change your opinion?

Each of these justifications has an air of reasonableness about it. However, each must be evaluated in the context of the others, the case as a whole, and other options available.

The Court appreciates the counter-productiveness of a less than effective witness and counsel's desire to avoid exposing such a witness to cross-examination and rebuttal. However, counsel's declarations suggest that Myronuk's deficiencies left not calling him to testify as the only reasonable alternative. Other choices, however, were objectively preferable.

Counsel had ample time - a year - between the first and second trial in which to work with Myronuk to try to help him appreciate and overcome communications problems. Failing that, he could have engaged a professional to undertake the task for him.[43] Failing that, he could have hired an alternative expert, or if more appropriate, a supplemental expert.

In the abstract, believing Myronuk fell short at trial one without pursuing other alternatives at trial two appears objectively unreasonable. As discussed below, it appears more so where defense counsel promises the jury that the expert will be called, then does not call him or even explain to the jury why he was not called, thereby inviting the ridicule here suffered at the hands of opposing counsel as well as the possible resentment generated in jurors who had been promised otherwise.

In conclusion, it must be said that the more reasonable choice in this case was to improve, supplement or replace Myronuk, not abandon him and his testimony.

(2)      *Resting Without Presenting a Defense Case*

(a)      Prosecution Burden Met?

In the second trial, defense counsel concluded that the prosecution had not proven

---

A. No.

(RT 8725.)

[43] A internet search will reveal no shortage of jury consultants or other such professionals.

1  its case beyond a reasonable doubt and so rested without calling any witnesses. (RT

2  8935-36; see also Rien Decl. at 4.) The court must ask whether such a strategy was

3  objectively reasonable in the circumstances of this case.

4       At the second trial the prosecution presented a case nearly identical to that

5  presented at the first trial. Trial counsel had defended that first trial by presenting several

6  witnesses, including an arson expert, to rebut the theories presented by the prosecution.

7  The jury hung, eleven to one for guilt. Eleven jurors at the first trial found the prosecution's

8  case persuasive of Petitioner's guilt even after hearing exculpatory evidence presented by

9  the defense. The prosecution's evidence, even when rebutted, nearly convinced all jurors

10  at the first trial of Petitioner's guilt beyond a reasonable doubt. Even Respondent

11  acknowledges that the "evidence supporting Petitioner's conviction for arson and murder

12  was strong." (Answer at 23.)

13       Counsel nevertheless later deemed the same evidence so lacking as to be

14  insufficient to establish guilt beyond a reasonable doubt. Counsel concluded that his cross-

15  examination of the government's witnesses had sufficiently created reasonable doubt.

16  According to Rien's declaration, he concluded that Sandoval and Reuscher's testimony

17  were "effectively neutralized" and the cross-examination of Evers allowed Petitioner's

18  counsel to introduce all the required testimony of Myronuk without presenting him or

19  subjecting him to cross-examination. (Rien Decl. at 4.) This Court's review of the cross-

20  examination at both trials does not reveal how the second cross-examination of Sandoval

21  and Reuscher was any more effective than at the first trial. Sandoval's testimony was

22  effectively questioned at both trials and a jury instruction addressed many of the points

23  made by Loftus at the first trial.[44] Cross-examination alone cannot be said to have effectively

24  undermined Reuscher's expert testimony. Counsel did question Reuscher regarding

25

26       [44] With respect to Sandoval, this Court previously concluded that no reasonable juror would credit
Sandoval's identification of Petitioner based on the "many uncertainties, contradictions, and

27  inconsistencies in her testimony and in the various reports of it." (Limitations F&R at 80-81.)

28

inconsistences in his testimony and suggest that his opinions were based on an incomplete investigation. However, the goal was to undermine scientific theories and conclusions which Reuscher adamantly defended. Absent an explanation from a defense expert as to why Reuscher's conclusions were not scientifically sound, it is difficult to believe that defense counsel's cross-examination and argument could successfully undermine them.

The Court is unable to identify an objectively reasonable basis for believing that defense counsel's cross-examination of the state's witnesses so negated the prosecution's case as to convince a jury the government had not met its burden.

(b)     Effects of Failure to Call Expert

The Court has already discussed the importance in this case of the scientific evidence and the relative advantages and disadvantages of calling a defense expert to rebut prosecution experts. Here, we consider the likely effect on the jury and the outcome of the case of not calling an expert.

Despite Myronuk's allegedly negative demeanor, something created reasonable doubt in the first trial and lead to a hung jury. Moreover, his testimony apparently had been considered persuasive enough to induce the prosecution to call three witnesses in rebuttal of Myronuk: Donald Patch, a supervisor at Pacific Gas and Electric; Steven Bauer, a special agent and certified fire investigator for the Bureau of Alcohol, Tobacco and Firearms ("ATF"); and John DeHaan, a forensic scientist who previously worked for the Alameda County Sheriff's Department, California Department of Justice, and the ATF. (RT 3952, 3970, 4005.) These witnesses made rebuttal points but also some concessions to Petitioner's case.[45] In addition, the prosecution devoted substantial time in closing

_____

[45] Patch testified that he did not see any signs of corrosion on the flex pipe delivering gas to the stove, but could not examine the brass flex connector to the flex pipe because it was missing. (RT 3964; 3968-69.) He admitted that brass flex connectors had been discontinued because of the danger of leaking caused by corrosion. (Id.) Bauer testified regarding his experience in conducting experiments involving gas explosions. (RT 3972.) DeHaan testified that in his expert opinion a gas leak would likely cause either a localized flame or a large forceful explosion. (RT 4008-09; 4013-16.) During cross-examination, DeHaan admitted that a fire investigation handbook that he authored cautioned investigators to consider real-life occurrences, such as currents and temperature differentials which may redistribute vapors and cause them to come in contact with an ignition source when determining the flow and ignition of gasses:

arguments to proffering reasons why Myronuk's testimony should not be believed. (See e.g., RT 4091-93, 4099, 4249-50, 4254, 4259, 4266-67, 4280, 4285-91.)

Cross-examination of Evers regarding Myronuk's testimony and opinions was very likely helpful to Petitioner's case. However, not presenting Myronuk as a witness deprived the jury of the ability to gauge his credibility and took away his opportunity to explain and justify his conclusions. California jury instructions direct jurors to assess and compare the credibility of expert witnesses in determining whether to rely on a given expert's testimony. Trial counsel deprived the jury of the tools with which to do so. In closing, the prosecution took advantage of the failure to call Myronuk and instructed the jury that it could disregard his opinions as lacking credibility because they were unexposed to the light of cross-examination and the jury's evaluation of his credibility.

It is difficult to understand how, in a capital murder case so dependent on scientific evidence, where a jury hung after hearing a qualified defense expert with poor demeanor, counsel could determine that presenting no expert witness would result in a better outcome.

(c)     Failure to Call Defense Witnesses - Promises Breached, Credibility Lost

At the first trial, counsel presented, in addition to Myronuk, an expert to question the reliability of Sandoval's testimony, a financial expert to explain that Petitioner was not financially desperate, a forensic psychiatrist to describe the unstable mental history of the adult victim (and hence plant a seed that perhaps she had started the fire), and several lay

"When assessing real-world distribution of vapors, the effects of temperature and air currents must not be overlooked. Mechanical activities such as a fan, furnace, operating machinery, or even someone walking will stir vapors into mixtures throughout a room. The draft created by a water heater, furnace burner, or open window may be enough to redistribute vapors and may draw them into contact with an open-flame ignition source at the same time." (RT 4021-23.)

"The alert investigator must be aware of all of these influences, including timer or thermostat-controlled equipment that may cycle on with no one in attendance, distributing and circulating vapors and possibly providing an ignition source as well." (RT 4022.)

witnesses to show that Petitioner lacked any motive to commit the offense and otherwise to undermine the prosecution's theory of the case.

This Court respects the wide latitude that must be given trial counsel to decide which, if any, witnesses to call at trial. Even a mistaken decision in that regard does not necessarily reflect ineffective assistance of counsel. That which hindsight reveals to have been error can very well have resulted from simple, unavoidable human frailty brought to the fore by a very intense and demanding litigation environment in which judgment must be exercised on the spur of the moment.

However, given the experience of trial one, no such ad hoc judgements were necessary here. A very detailed defense strategy had been developed, previewed and presented, with at least some success, to the first jury. That strategy was then suddenly, without any real change in the case, abandoned. In such a circumstance, the Court must examine the totality of the circumstances to determine if it was reasonable to reject the planned approach and gamble so much in a case in which a man's life hung in the balance. To make such a determination, the Court must look not only at the reasons offered by defense counsel for not presenting a case, but also the costs paid for implementing such a strategy. These include not only the above-described failure to rebut prosecution experts, but also the cost of breaching promises made in the opening statement and failing to offer any reasonable explanation for that breach.

In his opening, trial counsel promised he would call several witnesses to rebut the prosecution's case. He described in detail testimony to be provided by the defense's fire expert. He promised he would affirmatively show Petitioner's factual innocence. As noted, trial counsel then called one witnesses out of turn and rested without presenting a defense or without explaining the change.

Courts more frequently find the failure to call a witness to be of concern when counsel has promised the jury it would present a witness. Madrigal v. Yates, 662 F. Supp. 2d 1162, 1183 (C.D. Cal. 2009) ("[T]he record does not demonstrate any tactical reason for

Stein to announce to the jury that he would call his client to testify on his own behalf and then subsequently change his mind."); Ouber v. Guarino, 293 F.3d 19, 27 (1st Cir. 2002) ("Neither the state court nor the [Respondent] has managed to identify any benefit to be derived from such a decisional sequence, and we are unable to see the combination as part and parcel of a reasoned strategy."); Anderson v. Butler, 858 F.2d 16, 18 (1st Cir. 1988) (Even "if it was . . . wise [not to have the witness testify] because of the damaging collateral evidence, it was inexcusable to have given the matter so little thought at the outset as to have made the opening promise."); United States ex rel. Hampton v. Leibach, 347 F.3d 219, 259 (7th Cir. 2003) ("Making such promises and then abandoning them for reasons that were apparent at the time the promises were made cannot be described as legitimate trial strategy.").

While there are no Ninth Circuit cases directly addressing the issue of ineffective assistance of counsel arising from a broken promise to present testimony, two California district courts have relied on cases from other circuits to find ineffective assistance of counsel in such circumstances. See Madrigal, 662 F. Supp. 2d at 1183-1185; Williams v. Woodford, 859 F. Supp. 2d 1154, 1170-1171 (E.D. Cal. 2012) (Kozinski, J. Presiding).[46]

In Madrigal, the court found that petitioner was prejudiced by counsel's failure to call him as a witness after promising the jury in the opening statement that he would do so. Madrigal, 662 F. Supp. 2d at 1183-1185. The jury did not get to hear petitioner explain that he was at work at the time of the charged shooting or his theory that another person committed the crime instead. Id. The court found that the prosecution presented a weak case, and therefore the error in failing to have petitioner testify was greatly exacerbated. Id.

In Williams, the court found that counsel's failure to present petitioner and two of his friends as alibi witnesses, after promising to do so in the opening statement, was deficient performance under Strickland. Petitioner was charged with murder. Had he and his friends

_____

[46] Alex Kozinski, Chief Circuit Judge for the Ninth Circuit Court of Appeals, sat by designation in this matter originating from this district.

-75-

1  testified, he would have described how he was shopping at Wal-Mart when his apartment

2  was robbed and was at home later the next day when the alleged burglar was found dead.

3  Williams, 859 F. Supp. 2d at 1162-63. Counsel also explained how petitioner would cast

4  doubt on physical evidence linking petitioner to the victim. Id.

5       In determining deficient performance, California District Courts have relied on

6  decisions from several Courts of Appeal. The First Circuit has held that "defense counsel's

7  repeated vow that the jurors would hear what happened from the petitioner herself . . . in

8  conjunction with his subsequent decision to advise the petitioner against testifying" was

9  "indefensible" and deficient under Strickland. Ouber, 293 F.3d at 27-28. ("When a jury is

10  promised that it will hear the defendant's story from the defendant's own lips, and the

11  defendant then reneges, common sense suggests that the course of trial may be profoundly

12  altered. A broken promise of this magnitude taints both the lawyer who vouchsafed it and

13  the client on whose behalf it was made."). The First Circuit found a defense counsel's

14  unfulfilled promise during an opening statement to present key expert psychiatric witnesses

15  to be deficient performance. Anderson, 858 F.2d 16; see also United States v.

16  Gonzalez-Maldonado, 115 F.3d 9, 15 (1st Cir. 1997) ("A defendant's opening statement

17  prepares the jury to hear his case. If the defense fails to produce promised expert testimony

18  that is critical to the defense strategy, a danger arises that the jury will presume that the

19  expert is unwilling to testify and the defense is flawed.").

20       The Third Circuit has likewise found "[t]he failure of counsel to produce evidence

21  which he promised the jury during his opening statement that he would produce is indeed

22  a damaging failure sufficient of itself to support a claim of ineffectiveness of counsel."

23  McAleese v. Mazurkiewicz, 1 F.3d 159, 166 (3rd Cir. 1993).

24       The Seventh Circuit has been critical of counsel creating expectations in the minds

25  of jurors when promising to present witnesses and failing to follow through, finding that

26  counsel's promises caused further harm than the failure to present a given argument or

27  testimony alone. The Court explained that, "[w]hen counsel failed to produce the witnesses

28

-76-

to support this version, the jury likely concluded that counsel could not live up the claims made in the opening." Harris, 894 F.2d at 879; Leibach, 347 F.3d at 259 ("Making such promises and then abandoning them for reasons that were apparent at the time the promises were made cannot be described as legitimate trial strategy. Promising a particular type of testimony creates an expectation in the minds of jurors, and when defense counsel without explanation fails to keep that promise, the jury may well infer that the testimony would have been adverse to his client and may also question the attorney's credibility. In no sense does it serve the defendant's interests.") Furthermore, "[t]hose broken promises themselves supplied the jury with reason to believe that there was no evidence contradicting the State's case, and thus to doubt the validity of [petitioner]'s defense." Leibach, 347 F.3d at 260.

Based on the above described authority, Judge Kozinski found Williams' counsel to have been constitutionally deficient. Williams, 859 F. Supp. 2d at 1162-63. He explained, "In marked contrast to counsel's opening statement, which consists largely of promises of the exculpatory evidence he would present, his summation consists entirely of trying to poke holes in the prosecution's case. Either strategy may be appropriate, depending on the case. But priming the jury for the former and delivering only the latter is a recipe for failure." Id. at 1170. Prior to trial, counsel had extensive conversations with the judge and prosecutor regarding the defendant testifying. Id. at 1163. Despite the defendant's desire to take the stand, counsel was concerned that his testimony would be heavily impeached and could be admissible against defendant regarding other crimes, as defendant was a drug dealer. Id. Regardless, during the opening statement, counsel promised the jury that the defendant would testify. Id. "By promising the jury that [defendant] would testify, and would do so as to specific facts, the lawyer raised certain expectations in the jurors' minds, expectations that would count heavily against [defendant] when they went unfulfilled." Williams, 859 F. Supp. 2d at 1164. ("When a defendant's own lawyer causes jurors to wonder why he did not testify, this is a self-inflicted wound that's bound to undermine a defendant's

presumption of innocence.") The court continued:

> A promise in the opening statement that a witness will testify in a certain way is a pact between counsel and jury: He commits to present certain proof in exchange for the jury's implicit promise to keep an open mind until he has an opportunity to do so. Jurors take such commitments seriously and feel betrayed when the promise goes unfulfilled, especially if there's no explanation.

Id. at 1167. Finally, Judge Kozinski noted that the "jury will draw negative inferences from the unexplained absence of the promised testimony, and these inferences will fill any gaps that might otherwise exist in the prosecution's case." Id. at 1170.

For similar reasons, the court in Madrigal found counsel's performance deficient. That performance was of even greater concern as the "prosecution's case against [p]etitioner was weak," and in a "borderline case, such as this one, even a relatively small error is likely to tilt the decisional scales." Madrigal, 662 F. Supp. 2d at 1185 (citing Ouber, 293 F.3d at 33). Accordingly, the court held counsel's failure to present promised testimony to be a "monumental" and "egregious" error and that counsel's deficient performance prejudiced petitioner. Id.

In the present case, trial counsel promised the jury that an expert would testify that the fire was an accident, explain why it was an accident, and rebut claims by the prosecution experts that physical evidence proved arson. These remarks were not made casually in passing. Counsel repeatedly made unambiguous assertions regarding the expert and how his testimony was highly relevant to the threshold question of whether the fire was intentionally set and a crime committed.

As a result of trial counsel's failure to present an arson expert as promised, the jury had only prosecution expert's theories (challenged on cross-examination) regarding arson. As in Williams, the unfulfilled expectations that counsel created in the jurors' minds likely had a negative effect on the jurors' deliberations and "left the strong inference that everything [the promised defense expert] failed to deny must, in fact, be true." Williams, 859 F. Supp. 2d at 1164. The prosecution told the jury that they could "throw out" Myronuk's

1  testimony as lacking credibility solely based on his failure to appear and subject himself to
2  cross-examination. (RT 9020.) (See also ECF No. 1-14 (Ex. N) at 12.)[47]

3      Respondent's assertion that counsel's conduct was reasonable based on feedback
4  from "jurors from the first trial" lacks merit since, as noted, defense counsel was well aware
5  of the importance of expert testimony and of Myronuk's shortcomings long before the
6  second trial. He had ample time to prepare a reasonable response and to do so before
7  promising the jury he would call Myronuk. He could, instead, have advised the jury of his
8  intent to introduce Myronuk's testimony through cross-examination of Evers.

9      One can only then assume that trial counsel changed strategy during the second
10 trial. If so, he did so for reasons which remain undisclosed and unidentifiable. Regardless,
11 by promising to present Myronuk and then not doing so, defense counsel created an easy
12 opening for the prosecution to attack the credibility of both Myronuk and the defense and
13 gave the jury reason to disbelieve and distrust defense counsel.

14      In addition to Myronuk, the other defense witnesses were ready and available to
15 testify to the same exculpatory testimony they had provided at Petitioner's first trial. Counsel
16 does not explain why they were not called.

17      Specifically, several defense witnesses were to be called to undermine Hope
18 Warner's testimony about an alleged confrontation between Petitioner and Michelle Jones.
19 At closing, defense counsel spent significant time attempting to impeach her credibility (RT
20 9113- 9119), but was not able to do so through use of promised testimony from Warner's
21 employer, Russell Downing. (RT 3181-85.)

22      Also, despite promising to present Petitioner's girlfriend to show that she
23

24      [47] Petitioner provided an unsworn report of interviews of jurors after the conclusion of the case. At
25 least one juror commented that jurors were shocked, mad, and angry that the defense did not present any
   witnesses. Based on its inadmissibility, the Court shall not rely on the statements in determining if
26 counsel's performance was effective. Fed. R. Evid. 606(b)(2); Capps v. Sullivan, 921 F.2d at 262.
   Whether the actions of counsel were objectively reasonable must be based on the potential to adversely
27 affect the jury. A showing that the jury was actually upset based on counsel's actions is not required. (See
   Pet., Ex. N, ECF No. 1-14 at 12.)
28

-79-

1  accompanied Petitioner to the Greek Consulate and the UCSF Medical Center in San
2  Francisco on the day of the alleged altercation with Warner, counsel did not do so. (RT
3  3336-3341.) Counsel also lost the use of testimony from Daniel Jones, Jr.'s teacher to show
4  that Daniel was in school at the time of the incident. (RT 3196-97.)

5      Thus, not only was counsel's strategy to undermine Warner's credibility hampered
6  by his decision not to present rebuttal witnesses, the jury was left to ponder why defense
7  counsel did not do what it had promised to do and call rebuttal witnesses. Few, if any,
8  conceivable explanations reflect well on the defense.

9      Respondent argues that counsel made an "informed tactical decision" not to present
10  witnesses based on counsel's assertions that they had raised significant doubt based on
11  the cross-examination of the prosecution witnesses, and so could instead focus on the
12  "failings of the prosecution's case." (Answer at 31.) Performance under Strickland is based
13  on an objective standard and counsel's subjective reasoning is not relevant to determining
14  if his conduct was objectively reasonable.[48] See Cofske v. United States, 290 F.3d 437, 444
15  (1st Cir. 2002) ("The Strickland test . . . is an objective one; as long as counsel performed
16  as a competent lawyer would, his or her detailed subjective reasoning is beside the point.").
17  The Court has already explained that counsel's conclusion that reasonable doubt had been
18  established was not reasonable in light of the effect of the same evidence on eleven of the
19  twelve jurors in the first trial.

20      Respondent does suggest possible reasons for the decision not to present other
21  defensive witnesses. (Answer at 31-32.) Respondent argues that Petitioner's financial
22  expert did not dispute the figures used by the prosecution's expert even though he
23  disagreed with the ultimate conclusion; that it was reasonable not to call Petitioner's son or
24  girlfriend because they were inherently biased; that Petitioner's worker's compensation
25  attorney's testimony regarding his monetary recovery was speculative; that Downing and

26
27      [48] Except perhaps insofar as to invite the Court to consider explanations for the reasonableness of
counsel's conduct that had not occurred to it.
28

1  Crain only challenged Warner's credibility and did not contradict what she testified she

2  observed; and that Rosenthal's testimony regarding Michelle Jones's psychiatric history

3  would not be well received as it blamed the victim for the fire. (Id.) Such points of course

4  required consideration by trial counsel and by this court. Indeed, most every witness likely

5  has some credibility issue, attribute or mannerism that might detract from his or her

6  testimony, yet many still provide favorable testimony even when it is susceptible to criticism.

7  On the other hand, sometimes the negatives outweigh the benefit of calling the witness to

8  testify. It seems unlikely that such negatives arose with regard to each and every one of the

9  witnesses identified by defense counsel, but even if it had, a careful balancing of the benefit

10  and detriment of calling or not calling them had to have been made. There is no indication

11  any such balancing occurred here.

12                              (d)      Petitioner's Endorsement of Trial Strategy

13          Respondent argues that Petitioner's deferred to and joined in his counsel's decision

14  not to call witnesses. Even accepting as true counsel's disputed averment that Petitioner

15  "enthusiastically endorsed" Counsel's "bold suggestion" to forgo calling witnesses (Rien

16  Decl. at 5),[49] such endorsement does not excuse an otherwise unreasonable decision by

17  counsel. The Supreme Court has held that a determination of the reasonableness of

18  conduct under Strickland is not negated where a petitioner voluntarily follows counsel's

19  unreasonable advice. See Lafler v. Cooper, 132 S. Ct. 1376, 1390 (2012) (finding counsel's

20  advice that defendant accept plea deal constituted ineffective assistance of counsel despite

21  defendant's voluntary decision to follow counsel's advice.). Here, too, Petitioner's assent to

22  counsel's objectively unreasonable decision not to present a defense, especially after

23  promising to do so, is not relevant to determining counsel's effectiveness. Petitioner was

24  uneducated in the law and relied on counsel's advice. His willingness to accept counsel's

25  _____

26          [49] Petitioner, in his own declaration, states that he was "deeply concerned" about counsel's
   representation, specifically the decision not to present witnesses, but "was inexperienced in the law, and
27  assumed that [counsel] knew best." (Souliotes Decl., Pet., ECF No. 1, Ex. T.)

28

1  decision does not make that decision any more or less reasonable.

2  　　　　According to all of the evidence presented to the Court, Petitioner vigorously
3  proclaimed his innocence. (See Rien Decl. at 3.) ("[W]e had embarked on an all-or-nothing
4  strategy dictated by Mr. Souliotes' absolute insistence that he was innocent. This position
5  never wavered throughout my two year association with and representation of him; a
6  position he had maintained with his family and friends and to police investigators."); (Pet.,
7  Ex. S. (Christiansen Decl. ¶ 11.)) ("Mr. Souliotes had consistently maintained his innocence
8  throughout my representation of him."); (Pet., Ex. U (Souliotes Decl.)) ("I have always
9  maintained my innocence of these crimes.") Accordingly, Petitioner insisted that counsel
10  zealously argue his innocence. (Rien Decl. at 3.) ("Consequently, there was no middle
11  ground to argue anything but absolute innocence to the jury.") Despite Petitioner's desire
12  to present a defense based on his factual innocence and despite trial counsel's awareness
13  of Petitioner's desires, counsel persuaded Petitioner to rely instead on a defense based on
14  the prosecution's failure to meet its evidentiary burden.

15  　　　　The Supreme Court has long have "referred to [the ABA Standards for Criminal
16  Justice] as guides to determining what is reasonable." Rompilla v. Beard, 545 U.S. 374, 387
17  (2005); Wiggins v. Smith, 539 U.S. 510, 524 (2003); Strickland v. Washington, 466 U.S. at
18  688. According to the ABA's Standards of Criminal Justice, Part V, Control and Direction
19  of Litigation (Standard 4-5.2(b)) states "(b) Strategic and tactical decisions should be made
20  by defense counsel after consultation with the client where feasible and appropriate." It is
21  difficult to reconcile why counsel, after explaining that there was "no middle ground" to
22  argue anything but "absolute innocence" then proceeded to convince Petitioner otherwise.
23  Counsel states that he was sensitive to his influence over Petitioner and how he views his
24  role as one of creating options for the defendant, not making decisions for him. (Rien Decl.
25  at 5.) But here, it is does not appear that this was a strategic choice Petitioner would choose
26  to make. Even if Petitioner had made this decision to not present a defense, counsel's
27  failure to warn Petitioner of the consequences of failing to deliver on promises was

28

1    objectively unreasonable.

2         c.    Conclusion as to Effectiveness of Counsel

3         The state's expert testimony during the first trial was damning, but open to criticism

4    and impeachment. Most of the groundwork necessary to identify flaws in the prosecution

5    expert testimony had been undertaken by counsel and Myronuk at the first trial.[50] Thus all

6    that remained to be determined in this regard for trial two was whether to again present

7    expert rebuttal testimony. Failure to anticipate the need for and have ready an expert

8    qualified to testify is not, however, at issue here. Myronuk had been consulted and called

9    to testify at Petitioner's first trial. He was highly educated, well qualified in the field, and

10   boasted very impressive credentials. Counsel at Petitioner's second trial was well aware of

11   alternative theories and conclusions regarding the evidence at the scene of the fire. Since

12   opinions of the prosecution's experts were pervious to attack and competent competing

13   witnesses and theories were available, this Court must ask whether it was reasonable not

14   to present such rebuttal evidence. In doing so, the Court recognizes that it is not necessary

15   for every prosecution expert to be met with an opposing defense expert. Harrington v.

16   Richter, 131 S. Ct. at 791. The Court also is mindful of its duty to presume the

17   reasonableness of defense counsel's sound trial strategy.

18        As noted, defense counsel suggests that Myronuk's evidence was less than perfect

19   and that many, if not all of the points of impeachment, were made through effective cross-

20   examination and argument. But, as also discussed, such a scenario calls for a balancing

21   of the perceived negatives of calling the witness against the negatives of not calling him and

22

23   _____

24   [50] While defense counsel presented Myronuk in rebuttal at the first trial in an attempt to undermine
     the prosecution's expert's theories on cause and origin of the fire, it is very disturbing that in neither trial
25   did Myronuk or counsel question Reuscher and Evers regarding NFPA 921 and the leading fire
     investigation guide which warns against relying on low burning, extremely hot fires, and pour patterns in
26   post-flashover fires. David L. Faigman et al., Modern Scientific Evidence, §§ 26-2.1.3, 26-2.2.1 (1997)
     (Describing NFPA 921 as the "industry standard for fire investigation" and noting that "[t]here are few fields
27   where the ability of experts to disagree after viewing the same evidence is more of a problem that in fire
     investigation."). Petitioner raises this as his fourth claim of relief.

28

exploration of other alternatives.[51] There is no indication that any cost-benefit analysis or consideration of alternatives occurred here.

Counsel reportedly did consider potential negatives of calling Myronuk. Nothing indicates they considered the downside of not calling him.[52] Such a failure reflects ineffectiveness. The declaration and opinions of Mary Greenwood, submitted by counsel for Petitioner, are found to be well-qualified and persuasive evidence that Petitioner's counsels' decisions in regards to the fire expert were "unjustified and . . . lacking in sound legal foundation." (Decl. of Mary Greenwood, ECF No. 5.) The potential disadvantages of calling him were far less significant than the disadvantages of not calling him or at least carefully and persuasively explaining to the jury why he was not called. The significance of a failure to present expert witnesses when needed to attack forensic evidence has been noted. See, e.g., Duncan v. Ornoskie, 5 28 F.3d at 1235; Harris v. Reed, 894 F.2d at 878-879. That significance is greater here where the threshold issue - was it arson? - turned on expert opinion, where the prosecution's experts were so steeped in practical experience after years of serving the public in a dangerous profession, and where they were so certain of their conclusions. Thus, the "aura of special reliability" (United States v. Blade, 811 F.2d at 465.) attaching to expert testimony likely was particularly strong here.

Nevertheless, counsel who relied heavily on his expert's opinions did not allow the jury to hear the expert explain or defend those opinions. Instead, by failing to follow through

---

[51] In addition to the benefits identified in the cases discussed above, the Court's experience suggests advantages might also include consideration of the added weight jurors may give to testimony of someone who has impressive credentials and who may be designated by the court as an "expert"; the benefit of having such a person respond mid-case to claims of other experts and try to at least neutralize, if not destroy, them; the benefit of having such an apparently independent person first state (and also endorse and credit) arguments to be made by counsel at the close of trial; and the greater skepticism with which juries might view similar claims presented, whether on cross or closing, by an attorney who is expected to be focused first and foremost on winning his case.

[52] Curious that perhaps some other, as yet unidentified, consideration may have motivated this decision and the entire "defense rests" strategy, the Court invited the parties to propose offering further evidence on the ineffectiveness of counsel issues. Both responded that the Court had before it all the evidence it needed to consider.

1   on promises to present the expert, counsel invited very effective attacks on the credibility

2   of the defense and the defendant.

3        Cases discussing the potential adverse repercussions of breaching promises to the

4   jury have also been noted. A broken promise can taint both the lawyer and the client.

5   Ouber, 293 F.3d at 27-28. The failure to present a promised expert on a key point creates

6   the danger the jury will assume the expert is unwilling to testify and that the defense is

7   flawed. United States v. Gonzalez-Maldanado, 115 F.3d at 15; see also Harris, 894 F.2d

8   at 879; Williams, 859 F. Supp at 1162-63 (extended analysis of the consequences of such

9   a broken promise.). Also, as noted, the risk that such an error will prove particularly

10  monumental and egregious is more likely in a case where the remaining non-expert

11  evidence is weak. (Madrigal, 662 F. Supp. 2d at 1185). This was such a case.

12       Counsel's strategic decisions are given deference. However, in this case where

13  Petitioner faced the possibility of execution, where counsel had seen the benefit of

14  presenting a defense in trial one, where the same witnesses were ready, willing and able

15  to testify in trial two, and where trial counsel went to some length to describe who his

16  witnesses would be and what they would say, his "bold" trial strategy of presenting no

17  witnesses and no defense without giving a reasonable explanation for the change and for

18  his failure to keep his promises cannot be justified on an objectively reasonable basis. (Rein

19  Decl. at 5.) None of the explanations given by trial counsel or argued by Respondent are

20  reasonably persuasive or objectively reasonable. Even disregarding the benefit of hindsight,

21  the Court is unable to see in the information available to counsel at trial two any reasoned

22  and reasonable justification for the radical, unexplained and fatal change in strategy.

23       While recognizing possible justification for not calling one or more of the other

24  witnesses, calling them also offered potential advantages even if not all established the

25  points they were called to make. Each had the potential to create a hurdle over which the

26  prosecution would have to leap to earn the jury's confidence and verdict. Each might well

27  have planted at least a seed of doubt in the prosecutions's case. Any one of those seeds

28

may have been the one that prevented a unanimous finding of guilt beyond a reasonable doubt. For example, testimony from Petitioner's banker, unlawful detainer attorney, and son might have caused a juror to view with skepticism the state's claims that Petitioner was terribly upset about the Joneses' hold-over tenancy. It also would have emphasized Petitioner's agreement to allow the Joneses to stay through Christmas, strange behavior indeed from someone supposedly willing to kill them. Effective impeachment of the mobile home park manager's testimony about a confrontation between Petitioner and Ms. Jones may have caused at least one juror to question the prosecution's credibility and then wonder at its zealousness in calling such a witness. Jill LeBlanc could have presented a very plausible explanation for the otherwise weirdly coincidental movement of Petitioner's motor home the night of the fire. Objective evidence of Petitioner's financial status enabled defense counsel to argue that Petitioner had no financial incentive to destroy the house. However, calling the defense expert, Contractor, would have allowed that point to be made mid-trial and would have deprived the prosecution's accountant of the comfort of being the only "expert" on that subject. Similarly, even though much of Loftus's testimony about difficulties in eye-witness identification is and was covered by a California jury instruction, calling her to testify would have put that message before the jury early in the case, had its significance enhanced because it came from an "expert," and enabled it to be heard there, in argument, and also again  in jury instructions. In addition to Myronuk's attribution of the fire to a faulty flex hose, Rosenthal could have suggested to the jury the possibility of another cause, namely negligence or even suicidal tendencies on the part of Ms. Jones. These possibilities were at least as plausible as the rather implausible revenge and financial motives attributed to Petitioner. No one could have guaranteed the effectiveness of any of these claims. One could only hope that in combination they might generate that amount of doubt as would deprive a juror of confidence in the government's case.

However, the more important questions here are: Why were none of theses witnesses presented? What happened in the course of this trial to justify as objectively

1  reasonable counsel's decision not to call any of them? What caused counsel suddenly to
2  believe that he would obtain the same or a better result by presenting a much weaker
3  defense case then he had at trial one?

4     No reasonable answer has been provided. No reasonable explanation can be
5  imagined.

6     Counsel promised to show the jury that Petitioner was factually innocent. He could
7  have presented many witnesses to further that claim and Petitioner's case. Without the
8  testimony of the witnesses the jury was not provided critical information that could create
9  reasonable doubt. The Court need not and does not determine that each and every one of
10 these choices of defense counsel were objectively unreasonable. It does instead find that
11 the cumulative effect of: promising to call lay and expert witnesses in a case where their
12 presentation seemed apt; suddenly and radically, for unknown and unimaginable reasons,
13 changing strategy mid-trial and calling none of them; failing to offer any reasonable
14 explanation to the jury for the change; and instead simply deciding, in a case where the
15 prosecution already had effectively shown it could prove guilt beyond a reasonable doubt,
16 to rest without presenting a defense, caused counsel's performance to fall below an
17 objective standard of reasonableness.[53] Specifically, the cumulative effect of failing to
18 present an arson expert (claim two) and failing to present other defense witnesses (claim
19 three) in the context of this case was ineffective assistance of counsel. Petitioner has shown
20 that trial counsel was deficient with respect to claims two, three and seven of the petition.
21 See Strickland, 466 U.S. 687-88.

22                    d.    Analysis Regarding Prejudice

23     Under "Strickland, . . . to establish prejudice, a 'defendant must show that there is
24 a reasonable probability that, but for counsel's unprofessional errors, the result of the

25     _____

26     [53] It is important to note that the Court's determination in this regard was limited to review of the
evidence provided by the parties, i.e., trial and appellate records and declarations from trial counsel. The
27 parties were provided the opportunity to present additional evidence at a further evidentiary hearing, but
declined for reasons stated in the record.

28

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Wiggins v. Smith, 539 U.S. 510, 534 (2003) (quoting Strickland, 466 U.S. at 694). "[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." Strickland, 466 U.S. at 693. Rather, the appropriate question for the court is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.

The Supreme Court has established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair. Chambers v. Mississippi, 410 U.S. 284, 302-303 (1973); Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007). "In cases where there are a number of errors at trial, a balkanized, issue-by-issue harmless error review is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." Alcala v. Woodford, 334 F.3d 862, 883 (9th Cir. 2003) (internal citations omitted). "In those cases where the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors." United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996). The Ninth Circuit has repeatedly recognized that, in claims of ineffective assistance of counsel, prejudice may result from the cumulative impact of an attorney's multiple deficiencies. See, e.g., Boyde v. Brown, 404 F.3d 1159, 1176 (9th Cir. 2005) (quoting Cooper v. Fitzharris, 586 at 1333); see also Harris ex rel. Ramseyer v. Wood, 64 F.3d 1432, 1438 (9th Cir. 1995).

As discussed, the Court has identified a number of decisions by counsel which reflect error or ineffectiveness. The Court here has the relatively rare opportunity to compare the results of the two different paths taken by defense counsel; it can compare the result in a trial where an effective defense was presented with one in which no defense was offered. That comparison alone suggests that the failure to put on a defense was in fact harmful to Petitioner.

1    At both trials the prosecution presented nearly identical evidence and witnesses. The

2    only significant difference between the two was defense counsel's failure to present

3    witnesses or any defense at trial two. Trial one resulted in a hung jury; one juror had

4    reasonable doubt as to Petitioner's guilt. The jury at trial two deliberated for less than a day

5    to find Petitioner guilty. See Dugas, 428 F.3d at 335-336 ("The length of jury deliberations

6    can be one factor in determining how close the jury viewed the case to be."). It is

7    reasonable to surmise that a juror in trial two may well have developed the same

8    reasonable doubt as the juror in trial one if counsel, as promised, had presented an arson

9    expert to question prosecution witnesses' conclusions. The same is true with regard to the

10   failure to call witnesses who might, at a minimum, have planted a seed of doubt as to the

11   prosecution's motive evidence, explained Petitioner's whereabouts and his motor home's

12   movements on the dates in question, emphasized the defects in Sandoval's alleged

13   identification testimony and suggested other possible causes of the fire.

14       The Court finds the disparate results of the two trials  enlightening as to the apparent

15   prejudicial effect of the failure to present defense witnesses. And in this case that  prejudice

16   was exacerbated by the adverse consequences of trial counsel breaching his promises to

17   the jury about the defense he would present and then compounding the negative effect of

18   that breach by failing to explain the change in strategy or otherwise trying to mitigate its

19   effect. The defense strategy in trial two gave the prosecution the opportunity to lambast the

20   defense for failing to present witnesses, most notably the "mythical Dr. Fire," the "Where's

21   Waldo" expert, and expose the defense and the defendant to ridicule.

22       Respondent asserts that Petitioner was not prejudiced by the failure to present

23   witnesses in rebuttal because the evidence against Petitioner was strong and the testimony

24   not likely to change the result. This Court already has found that the remainder of the

25   prosecution's evidence was so weak as to not likely produce a conviction. Additionally,

26   Respondent's argument ignores the injurious effect of a counsel inexplicably breaking his

27   promise to jurors.

28

1       A noted, the prosecution's case was indeed vulnerable. Its main eyewitness suffered

2  significant credibility concerns. The fire investigators hastily came to conclusions based on

3  inaccurate and incomplete review of the physical evidence. In such a close case, defense

4  counsel's errors are amplified and likely more critical. See Strickland, 466 U.S. at 696 ("[A]

5  verdict or conclusion only weakly supported by the record is more likely to have been

6  affected by errors than one with overwhelming record support."); see also Luna v. Cambra,

7  306 F.3d 954, 966 (9th Cir. 2002) ("[W]e must consider the relative strength of the

8  prosecution's case in analyzing whether counsel's errors prejudiced [the petitioner].");

9  Dugas, 428 F.3d at 335-336 ("This case lay on a knife edge, and it would not have taken

10  much to sway at least some jurors towards acquittal. Accordingly, the threshold for prejudice

11  is comparatively low because less would be needed to unsettle a rational jury.").

12      Petitioner has made a sufficient showing that he was prejudiced by counsel's

13  unprofessional conduct.[54] Given the cumulative effect of the errors committed by Petitioner's

14  trial counsel, the Court concludes that there is a reasonable probability that, absent the

15  deficiencies, the outcome of Petitioner's trial would have been different. Strickland, 466 U.S.

16  at 695. In fact, the errors rendered the proceeding fundamentally unfair. Harris ex rel.

17  Ramseyer, 64 F.3d at 1438; see also Strickland, 466 U.S. at 696 (determining that the

18  "ultimate focus of inquiry must be on fundamental fairness of the proceeding whose result

19  is being challenged"). Without determining whether each of the errors alone was  sufficiently

20

21       [54] The Court does not ignore Petitioner's contention that this Court's finding of actual innocence
also established prejudice because actual innocence "required . . . a stronger showing than that needed to

22  establish prejudice" under Strickland. Schlup, 513 U.S. at 327. It is true that actual innocence requires a
strong burden of proof. However, in determining Petitioner's innocence, this Court reviewed "all the

23  evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be
admitted under rules of admissibility that would govern at trial." House v. Bell, 547 U.S. 518, 538 (2006)

24  (internal citations omitted). For the present determination, the Court must determine if Petitioner was
prejudiced solely by the constitutionally ineffective assistance of counsel at trial. Strickland, 466 U.S. at

25  694 (Finding prejudice if there is "a reasonable probability that, but for counsel's unprofessional errors, the
result of the proceeding would have been different."). Petitioner benefitted in his showing of innocence by

26  Respondent's concessions that much of the scientific evidence at trial was not reliable. That unreliability is
not relevant to the present determination, because Respondent did not make those concessions until

27  years after trial. As such, Petitioner's showing of innocence is not relevant to his showing of prejudice
under Strickland.

28

prejudicial to Petitioner to warrant habeas relief, their cumulative impact deprived Petitioner of a fundamentally fair trial and severely undermines the Court's confidence in the jury's verdict.

Petitioner is entitled to relief as to claims two, three and seven.

## V.   RESERVATION OF REMAINING CLAIMS

Petitioner is entitled to relief on claims one, two, and seven of the first amended petition. Accordingly, a determination of the remaining claims is unnecessary. Claims four through six all relate to alleged errors in the conduct of petitioner's trial. (See ECF No. 151 at 27-33.) In granting the petition on claims two, three and seven, however, the Court is necessarily finding that a retrial is necessary. See Blazak v. Ricketts, 971 F.2d 1408, 1413 (9th Cir.1992) (A district court order requiring the state to retry the Petitioner was final because it "left nothing to be done but the execution of the judgment," "disposed of all the conviction related claims," and "granted all the relief requested."); Buckley v. Terhune, 266 F. Supp. 2d 1124, 1144 (C.D. Cal. 2002) (Further, "[e]ven if petitioner prevailed on one or more of his other claims, he could obtain no greater relief than that to which he already is entitled."). The Court therefore reserves judgment on the remaining claims of the petition. Blazak, 971 F.2d at 1413 ("[W]hen habeas is granted on a conviction issue rather than a sentencing issue, requiring the district court to resolve at one time all the issues raised in the petition could actually delay the proceedings unnecessarily and waste the district court's scarce judicial resources.").

## VI.   RECOMMENDED RELIEF

### A.   Conditional Release

It is well established that federal district courts have broad discretion in conditioning a judgment granting habeas relief. Hilton v. Braunskill, 481 U.S. 770, 775 (1987). Pursuant to 28 U.S.C. § 2243, federal courts are authorized to dispose of habeas corpus matters "as law and justice require." "In modern practice, courts employ a conditional order of release in appropriate circumstances, which orders the State to release the petitioner unless the

State takes some remedial action, such as to retry (or resentence) the petitioner." Harvest v. Castro, 531 F.3d 737, 741-742 (9th Cir. 2008) (citing Wilkinson v. Dotson, 544 U.S. 74, 89 (2005) (Kennedy, J., dissenting); Herrera v. Collins, 506 U.S. 390, 403 (1993); Hilton v. Braunskill, 481 U.S. 770, 775 (1987) ("[T]his Court has repeatedly stated that federal courts may delay the release of a successful habeas petitioner in order to provide the State an opportunity to correct the constitutional violation found by the court."); In re Bonner, 151 U.S. 242, 259-60 (1894)). "[C]onditional orders are essentially accommodations accorded to the state, in that conditional writs enable habeas courts to give States time to replace an invalid judgment with a valid one. The consequence when the State fails to replace an invalid judgment with a valid one is always release." Harvest v. Castro, 531 F.3d at 742 (quotations omitted).

Accordingly the Court recommends that Petitioner be ordered released within thirty days of the adoption of the instant Findings and Recommendation by the District Court Judge unless Respondent notifies the Court of the state's intent to retry Petitioner.

**B.     Pending Supreme Court Decision in *Perkins v. McQuiggin***

On October 29, 2012, the United States Supreme Court granted certiorari in McQuiggin v. Perkins (12-126, Oct. 29, 2012) (Perkins). The Supreme Court is to address whether there is an actual innocence exception to the statute of limitations under AEDPA and whether the exception requires a showing of diligence on behalf of Petitioner. Perkins, Supreme Court Docket No. 12-126. The pending decision is directly relevant to this Court's past findings.

In light of the grant of certiorari, on November 2, 2012, Respondent filed a motion to stay the proceedings until the matter is resolved by the Supreme Court. (Mot. To Stay, ECF No. 168.) Petitioner filed an opposition to the motion to stay on November 6, 2012. (Opp'n, ECF No. 170.) The Court shall address the issues raised by Respondent's motion to stay by way of a separate order.

1

## VII.   CONCLUSION AND RECOMMENDATION

Accordingly, IT IS HEREBY RECOMMENDED that the Court find that Petitioner is entitled to relief of claims two, three and seven of the First Amended Petition for Writ of Habeas Corpus and that Petitioner be GRANTED conditional release.

This Findings and Recommendation is submitted to the assigned District Judge, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1) and Local Rule 304. Within fourteen (14) days after being served with the Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections.

The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:    March 6, 2013          _____ /s/ Michael J. Seng
                                 UNITED STATES MAGISTRATE JUDGE